**EXHIBIT A**

1

1          IN THE UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
                       -  -  -
3
   CHECKPOINT SYSTEMS,   :
4  INC.,                 :
          Plaintiffs    :
5                        :
          vs.            :    01-CV-2223 (PBI)
6                        :
   ALL-TAG SECURITY      :
7  S.A., ALL-TAG         :
   SECURITY AMERICAS,    :
8  INC. and SENSORMATIC  :
   ELECTRONICS           :
9  CORPORATION,          :
          Defendants    :
10
                       -  -  -
11
                   Oral Deposition of NEIL D.
12
   AUSTIN, was taken pursuant to notice, held at
13
   the offices of Pepper, Hamilton, Two Logan
14
   Square, Philadelphia, Pennsylvania, on
15
   Thursday, July 17, 2003, beginning at or about
16
   9:30 a.m., before Jeanne Christian, Court
17
   Reporter-Notary Public, there being present:
18
                       -  -  -
19
   APPEARANCES:
20
               MONTGOMERY, McCRACKEN, WALKER
21             & RHOADS, LLP
               BY:  STEPHEN W. ARMSTRONG,
22             ESQUIRE
               123 South Broad Street
23             Philadelphia, Pennsylvania 19109
               Phone:  (215) 772-7552
24             Representing the Plaintiff

25

2

```
 1   APPEARANCES CONTINUED:

 2              BREINER & BREINER, LLC
               BY:  THEODORE ADAM BREINER,
 3             ESQUIRE AND JENNIFER A.
               PULSINELLI, ESQUIRE
 4             115 North Henry Street
               Alexandria, Virginia 22314
 5             Phone:  (703) 684-6885
               Representing All-Tag Security
 6             S.A. and All-Tag Security
               Americas, Inc.
 7
               MORGAN & FINNEGAN
 8             BY:  RICHARD W. ERWINE, ESQUIRE
               345 Park Avenue
 9             New York, New York 10154
               Phone: (212) 415-8538
10             Representing Sensormatic
               Electronics Corporation
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NEIL D. AUSTIN

114

1    A.    I need to ask you a privilege question.

2                    MR. ARMSTRONG:   Sure.

3                         -  -  -

4                    (Whereupon a short break

5    was taken at this time.)

6                         -  -  -

7                    (Whereupon the court

8    reporter read back the pending question.)

9                         -  -  -

10                   THE WITNESS:   I have had a

11   variety of discussions that I would refer --

12   and have received, Checkpoint has received, in

13   the course of those discussions, what I would

14   refer to as opinions related to the '555

15   Patent, and they have involved counsel in

16   Switzerland and in the United States.

17   BY MR. BREINER:

18   Q.    And how many opinions total?

19   A.    I don't know how to answer your

20   question.   I'm confused whether if one person

21   gives the same opinion twice, is that two?

22   Q.    Let's talk then specifically about

23   occasions, as opposed to conversations.   These

24   formal oral opinions were -- strike that.

25                   When was the first formal

NEIL D. AUSTIN

115

1  oral opinion that you received with respect to

2  the '555 Patent?

3  A.    That would have -- Checkpoint would have

4  received that in the '97 range, I believe.

5  Q.    And can you be more specific, beginning

6  in '97, middle, end?

7  A.    You are only asking about the formal, my

8  description of formal versus informal?

9  Q.    That's correct.

10  A.    If you are asking about the formal, I

11  don't have a time frame in '97 for that.

12  Q.    Who did you receive the opinion from?

13  A.    Various counsel in Switzerland who

14  represented the company in the action of

15  Checkpoint or Actron, Checkpoint, in the broad

16  sense, against All-Tag and Sensormatic.

17  Q.    And who was the person that gave you

18  that opinion?

19  A.    Francois Cover, patent counsel, and

20  Lentz & Staley, our counsel of -- Doctor

21  Lutz.  What is his first name?  Not Doctor.

22  It is L-U-T-Z.  And I can't think of the more

23  junior person who was probably involved in the

24  discussion.

25  Q.    And what was that opinion that he gave

NEIL D. AUSTIN

116

1   you?

2   A.    That the product manufactured by All-Tag

3   would be covered by the claims of the '555

4   Patent in the United States similar to the

5   coverage or coverage over the All-Tag product

6   in Switzerland on the Swiss corresponding

7   patent of the '555 Patent.

8   Q.    And why did he give that opinion to

9   you?  What was the occasion or the

10  circumstances that he was giving that opinion

11  to you?

12  A.    It was in the course of their

13  representation of Checkpoint in its patent

14  infringement suit against All-Tag and

15  Sensormatic in Switzerland.

16  Q.    Was the infringement suit started in

17  1997?

18                 MR. ARMSTRONG:  You mean

19  the one in Switzerland?

20                 MR. BREINER:   In

21  Switzerland.

22                 THE WITNESS:  I believe it

23  was a bit earlier than '97.  It may have been

24  -- I would be guessing.  I believe it was in

25  and around -- it was '96, '97 range, yes, I

NEIL D. AUSTIN

117

1    believe.

2    BY MR. BREINER:

3    Q.    Would they have given you that same

4    opinion before the lawsuit was filed in

5    Switzerland?

6                    MR. ARMSTRONG:  Objection

7    to the question.  Under what circumstances?

8                    MR. BREINER:  The same

9    circumstances, formal oral opinion.

10                   MR. ARMSTRONG:  You said

11   would they have given it to you, which is

12   conditional.

13   BY MR. BREINER:

14   Q.    Did they give you this same opinion

15   before the suit was filed in Switzerland?

16   A.    No, I believe not.

17   Q.    Did they give you an opinion that the

18   Swiss patent, the counterpart to the '555, was

19   infringed before the suit was brought in

20   Switzerland?

21   A.    Yes.

22   Q.    Now, we have talked about that that was

23   the first formal opinion that you recall in

24   the '97 range.

25                   What would be the second

NEIL D. AUSTIN

118

1   one?

2   A.     I believe there was another what I refer

3   to as a formal, oral discussion opinion.   My

4   recollection is that the next one would have

5   been some time around 1999 range.

6   Q.     And who gave that opinion?

7   A.     That would have been by the -- a patent

8   lawyer in the firm of what is now Akin Gump,

9   then would have been the Panage, Schwarzee,

10  Jacobson, Adele firm.

11  Q.     Who was the person that gave that

12  opinion?

13  A.     I believe it was Leslie Kasten is my

14  recollection.

15  Q.     Can you spell the last name?

16  A.     K-A-S-T-E-N.

17  Q.     Under what circumstances was he giving

18  that opinion?

19  A.     Based on discussions with me related to

20  the -- I believe, by that point, the victory

21  in the Swiss litigation.

22  Q.     And what was the opinion that he gave?

23  A.     That the All-Tag product infringed the

24  various claims of the '555 Patent.

25  Q.     And you have indicated this was in the

1   '99 range.  When in '99?

2   A.    I don't recall specifics.

3   Q.    Do you have any notes that may help

4   refresh your recollection?

5   A.    No.  I place it in the '99 range --

6   maybe just to help you out, this suit was

7   commenced, I think, in May of 2001?

8   Q.    That's correct.

9   A.    I place it in '99 some time, because I

10  was recommending to the company that the suit

11  against All-Tag and Sensormatic be filed in --

12  at that time, and that was approximately,  --

13  approximately, two years prior to the

14  institution of this suit.  But I have no

15  better dating for that.

16  Q.    And why were you recommending to the

17  company that a lawsuit be commenced against

18  All-Tag and Sensormatic?

19                  MR. ARMSTRONG:  I'm going

20  to object to the question and instruct the

21  witness not to answer any further questions on

22  this subject on grounds of privilege.

23  BY MR. BREINER:

24  Q.    Who was present besides you and Mr.

25  Kasten when this opinion was rendered by Mr.

NEIL D. AUSTIN

120

1  Kasten?

2  A.    No one.

3  Q.    You indicate you were recommending to

4  the company that suit be brought against

5  All-Tag and Sensormatic.

6                    Why wasn't a lawsuit

7  commenced at this time?

8                    MR. ARMSTRONG:  I object

9  and instruct the witness not to answer the

10  question as beyond the scope of the subjects

11  for which the witness is presented to testify

12  and to the extent that the answer might

13  involve any privileged information or

14  communication.

15  BY MR. BREINER:

16  Q.    Prior to this 1999 time range, did you

17  ever recommend to the company that suit be

18  brought against All-Tag -- strike that.  Let

19  me start again.

20                    Prior to this 1999 time

21  range that you are referring to, did you ever

22  recommend to the company that suit be brought

23  against All-Tag for infringement of the '555

24  Patent?

25                    MR. ARMSTRONG:  I'm going

227

1                    C E R T I F I C A T E

2                          - - -

3   STATE OF NEW JERSEY          :

4                                :     SS

5   COUNTY OF BURLINGTON         :

6

7                    I, Jeanne Christian,

8   Court Reporter-Notary Public within and for

9   Burlington County, Commonwealth of New Jersey,

10  do hereby certify that the foregoing testimony

11  of Neil D. Austin was taken before me at Two

12  Logan Square, Philadelphia, Pennsylvania on

13  Thursday, July 17, 2003; that the foregoing

14  testimony was taken in shorthand by myself and

15  reduced to typing under my direction and

16  control, that the foregoing pages contain a

17  true and correct transcription of all of the

18  testimony of said witness.

19

20

21                    _Jeanne Christian_

22                    JEANNE CHRISTIAN
                      Notary Public

23

24                    My Commission expires
                      May 21, 2007

25

ProTEXT Transcript Condensing for Windows

SHEET 1   PAGE 1

00001
```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3
   CHECKPOINT SYSTEMS, INC.,
 4          Plaintiff
 5
          vs.                    Civil Action
 6                               01-2223
 7   ALL-TAG SECURITY S.A.,
     ALL-TAG SECURITY AMERICAS, INC.,
 8   and SENSORMATIC ELECTRONICS CORP.,
          Defendants
 9
10                               Day 1 of Trial
                                 January 29, 2007
11                               Courtroom 9-B
12                               Philadelphia, PA
13      Before THE HONORABLE PETRESE B. TUCKER, J.
                 and a Jury
14
15
   APPEARANCES:
16
17   Dennis R. Suplee, Esq.         For the Plaintiff
     Thomas W. Hazlett, Esq.
18   Robert A. McKinley, Esq.
     SCHNADER HARRISON SEGAL
19      & LEWIS LLP
     1600 Market Street
20   Suite 3600
     Philadelphia, PA  19103-7286
21
22              Nancy O'Neill
                Suzanne White
23              Sidney Rothschild
                Official Court Reporters
24              1234 U.S. Courthouse
                601 Market Street
25              Philadelphia, PA  19106
```

PAGE 2

00002
```
 1   APPEARANCES:  (cont'd)
 2
 3   Theodore A. Breiner, Esq.       For All-Tag
     Jennifer A. Pulsinelli, Esq.
     BREINER & BREINER, LLC
 4   115 North Henry Street
     Alexandria, VA   22314
 5
 6
 7   Tracy Zurzolo Quinn, Esq.
     REED SMITH, LLP
     2500 One Liberty Place
 8   1650 Market Street
     Philadelphia, PA  19103
 9
10
11   M. Kelly Tillery, Esq.         For Sensormatic
     Erik N. Videlock, Esq.
     PEPPER HAMILTON, LLP
12   3000 Two Logan Square
     18th and Arch Streets
13   Philadelphia, PA  19103-2799
14
15
16
17
18
19
20
21
22
23
24
25
```

PAGE 3

00003
```
 1                    PROCEEDINGS
 2          (After the panel was sworn by the courtroom
 3   deputy, voir dire proceeded as follows:)
 4          MR. SUPLEE:  Good morning, ladies and
 5   gentlemen.  My name is Dennis Suplee and I'm one of the
 6   lawyers involved in this case.  And one thing which all
 7   the lawyers agree this morning is that our objective in
 8   asking you questions today is to try to get a jury that
 9   can be fair to both sides.
10          I'm going to start by reading to you a very
11   short prepared statement that the parties have agreed
12   upon as to what this case is all about:  Plaintiff
13   Checkpoint contends that defendants All-Tag Security
14   S.A, All-Tag Security Americas, Inc. and Sensormatic
15   have infringed and are infringing Checkpoint's patent by
16   selling and offering to sell in the United States what
17   are called deactivatable resonance labels that have the
18   same elements as the Checkpoint patent.  In this
19   lawsuit, Checkpoint seeks a determination that
20   defendants have infringed the patent.  Defendants deny
21   they have infringed or are infringing Checkpoint's
22   patent and also contend that the patent is invalid for
23   various reasons and that Checkpoint cannot enforce its
24   patent because of alleged delay by Checkpoint in
25   bringing this lawsuit.
```

PAGE 4

00004
```
 1          So I'm going to ask you a series of questions.
 2   The objective is not to pry into your business but to
 3   try to find out what we can about you that would be
 4   helpful to the lawyers in seating a jury.
 5          Knowing only those facts that I just read to
 6   you, is there anybody here who would find it difficult
 7   or impossible to resolve this case fairly?
 8          Are you or any members of your family or
 9   household an employee of Checkpoint?
10          Same question with respect to All-Tag Security
11   S.A.?
12          Same with All-Tag Security Americas, that is,
13   are you or any member of your family or household an
14   employee?
15          And finally Sensormatic, are you or any member
16   in your household or family employed by Sensormatic?
17          To your knowledge does your employer have any
18   business or other relationship with any of those
19   companies, that is, Checkpoint, the All-Tag companies or
20   Sensormatic?  Or has it ever had such a relationship?
21          Do you or anybody in your family or household
22   have any business or other relationship with any of
23   these parties?
24          A JUROR:  Can I ask a question?  Is that using
25   the system?
```

ProTEXT Transcript Condensing for Windows

SHEET 5   PAGE 17

00065

1   had back surgery for a ruptured disk.
2          THE COURT:  We will strike her.
3          MR. SUPLEE:  We have stricken two.
4          THE COURT:  Two, 3.
5          MS. QUINN:   4, 5, 7, 8, 15, 28 and 30 is
6   what I have.
7          MR. SUPLEE:   Can you read those again a
8   little slower.
9          MS. QUINN:  2, 3, 4, 5, 7, 8, 15, 28, 30 is
10  what I have.  I don't know if anyone else has
11  anything.
12         MR. SUPLEE:  I'm sorry to make your life so
13  hard.
14         THE COURT:  Is that it?
15         The jurors need to eat, they have been here
16  since 8 or 8:30.  We will break and give them until
17  2 o'clock.
18         MR. TILLERY:  When we get back we will deal
19  with the motions?
20         THE COURT:  You will pick them, then we will
21  deal with the motions that are outstanding.
22         MR. SUPLEE:  Thank you, your Honor.
23         MS. QUINN:  Thank you, your Honor.
24         (Luncheon recess)
25         AFTERNOON SESSION

PAGE 18

00066

1          THE COURT:  Good afternoon.  You may be
2   seated.  We have our jury.  I let them go home until
3   tomorrow morning because I figured it would be, rather
4   than watching the clock for purposes of the motions,
5   we can do the motions comfortably and then proceed
6   first thing tomorrow morning with the jury.
7          I received some motions filed recently by
8   Checkpoint to preclude certain testimony.  So I guess
9   we will proceed to have argument on those motions.
10         There was no response filed to the motions so
11  I don't know that you were given an opportunity to
12  file a response.
13         MR. SUPLEE:  We received it at 9:45 this
14  morning in the courtroom, your Honor.
15         If the Court would prefer, we would certainly
16  submit a writing.  I think we can say more and better,
17  I hope, I can say it adequately today so that won't be
18  necessary and we can get a prompt start tomorrow
19  morning.
20         THE COURT:  I don't think it would be
21  necessary.
22         Mr. Breiner.
23         MR. BRIENER:  Thank you.
24         May it is please the Court.
25         Your Honor is correct, this morning

PAGE 19

00067

1   defendants All-Tag and Sensormatic did file a motion
2   to preclude the testimony of Checkpoint's expert
3   witness, Dr. Zahn, on the issue of infringement of
4   product two, that's made by All-Tag.
5          Product two is the product that All-Tag
6   currently makes as its commercial product.  It is the
7   one it is selling today.  It began making that product
8   in approximately April 2001.
9          And, Sensormatic has joined the motion, I
10  believe Mr. Tillery would like to argue it somewhat.
11         Your Honor, just as background, All-Tag has
12  made two basic products throughout its existence, one
13  is what we call product one, under one of its patents
14  we call the '466 patent, that product was made from
15  approximately the inception of the company in 1994 to
16  approximately April of 2001.
17         After that date they changed their
18  manufacturing process and made a different product,
19  which has different structure, that's what we have
20  been calling process two, product two made by another
21  patent of All-Tag, called the '342 patent. I said made
22  under the patents.  It is generally, the general
23  process, not everything in there.
24         In this case we have provided to Checkpoint
25  in response to their discovery information on product

PAGE 20

00068

1   one information, on product two, we did that early in
2   the case.
3          We gave them on product two our patent
4   application, we gave them that with the scanning
5   electronmicroscope pictures that actually shows the
6   product, goes back to October of '92.
7          What happened in this case is we had expert
8   discovery and expert reports.  We received
9   Checkpoint's expert report on June 1st of 2006.  We
10  took their expert's deposition, Dr. Zahn on June 23,
11  2006.
12         At Dr. Zahn's deposition, he testified that
13  the only -- he testified he didn't know the All-Tag
14  process.  He never saw it.  His testimony was based on
15  seeing a videotape of the All-Tag process that was
16  produced by us, that was used in the first case before
17  the ITC.
18         He said he also looked at the '466 patent
19  that has been called the Pichl patents.  He said he
20  reviewed a certain number of tags, they were
21  referenced in his expert report.
22         He testified that he did not review All-Tag's
23  second process generally used as the '343 patent, that
24  he didn't even know that All-Tag had a second process.
25         He said if there is more than one process, I

SHEET 6   PAGE 21

00069

1  don't know it.  He said Checkpoint never told me that.
2  I reviewed what's in this report.  He said all of
3  these exhibits to my report are pictures of the tags
4  that I reviewed, in which I have opined on.  He opined
5  there was infringement.
6          Everyone of those tags he reviewed is product
7  one, he has never reviewed product two.
8          He doesn't know the process for product two.
9  He doesn't know the structure for product two.
10         The reason we brought this motion at this
11 point and time, your Honor, was we received the
12 Markman decision on June 23rd of last week.  We looked
13 at that decision and we went the other way, but we
14 said, in order to streamline this case, let's concede
15 infringement on product one, process one.
16         We filed the proposed stipulation.  We gave
17 it to counsel this morning.
18         And, part of the reason for, you know, the
19 Sunday activity on this was we did not review the tags
20 that Dr. Zahn had looked at until yesterday.  We
21 wanted to do it on Friday or Thursday, because of
22 logistics, Dr. Zahn had the tags, they were only
23 available on Sunday.  We reviewed them with a
24 representative from All-Tag, who is familiar with
25 really the circuit phase, you can tell the timeline.

PAGE 22

00070

1  We reviewed those yesterday, we determined that every
2  one of the products that Dr. Zahn looked at was
3  product one.  In fact, the majority of the products
4  that they looked at was or were tags from that, were
5  made by All-Tag, Switzerland not our product, All-Tag
6  Belgium.  They are tags, that are not even a defendant
7  in this case.  They were made prior to 1995.  We saw
8  that, that's what prompted this motion.
9          This motion is in effect a Daubert motion.
10 As the Court knows is the gatekeeper to keep out
11 improper evidence.
12         It is our position if Dr. Zahn has never
13 examined product two, he has never examined process
14 two.  He doesn't know what the structure is.  There is
15 no way that he can come into this courtroom and opine
16 in front of the jury that All-Tag's product two and
17 process two infringes.  It would be unfairly
18 prejudicial to All-Tag, it would taint the jury and
19 would cause endless confusion.
20         So it is our position, your Honor, as a
21 matter of law, he just cannot testify because he did
22 not look at the product.
23         In other words, in an infringement case the
24 plaintiff has to come forward and say we have an
25 expert.  Our expert reviewed the product, and he

PAGE 23

00071

1  compared it to the claims of the patent, to the
2  product and made a determination that's an
3  infringement.  He can opine on infringement.  He
4  hasn't done that.
5          So, it is our position he should be precluded
6  from testifying in this case on product two.  That's
7  the gist of our motion, your Honor.
8          Based on our position, on our stipulation on
9  infringement of product one and process one, then no
10 evidence should come in on product one or process one
11 on their direct case.
12         If your Honor grants these motions, as we
13 respectfully suggest that you should, Checkpoint
14 doesn't have an infringement case, because product one
15 is out, subject to our defenses and then we lose on
16 those.  We appeal.
17         Product two is out because they don't have
18 any witness that can testify as to product two.  Every
19 one of the Checkpoint's employees testified, they
20 don't know what the All-Tag process is.  They never
21 reviewed it for infringement.  There is not a witness
22 to testify before that jury there's infringement on
23 product two.
24         Your Honor, we request that you enter an
25 order precluding Dr. Zahn from testifying as to

PAGE 24

00072

1  infringement of product two.
2          One thing that Dr. Zahn did say, he said in
3  response to my question during his deposition, he said
4  I have never seen this patent that All-Tag makes, the
5  second process and I didn't base my report on,
6  subsequently to my deposition, I looked at it.
7          He said in response to redirect, it is my
8  opinion this patents doesn't change my opinion, my
9  expert report.
10         It doesn't change his expert opinion in the
11 report that product one infringes.
12         He said:  I find that this patent that
13 All-Tag owns or is licensed under is an infringement
14 of the '555.
15         Well, your Honor, you don't infringe a
16 patent, you infringe a product.  The patent has a
17 number of embodiments we cited in our brief.
18 One case, that's the Shertec case, a recent decision
19 by the federal circuit in September of 2006; that case
20 dealt with basically the same issue.  It reversed the
21 Court, finding infringement on summary judgment,
22 saying that the plaintiff's expert, a patent owner
23 relied upon the fact that the alleged infringer said,
24 we practice our patent.  The federal circuit said that
25 is not acceptable, it is not acceptable evidence.

ProTEXT Transcript Condensing for Windows

00112

```
 1   practicing and not using.  So the fact that the patent
 2   is not being used does not in any way indicate that
 3   somebody is not going to attempt to enforce the patent
 4   if infringement takes place as defendants have pretty
 5   much stipulated took place in this case.
 6              THE COURT:  Well, let me just look at the
 7   other side and assume that the defense will argue that
 8   maybe that's correct if that is the only point or the
 9   only issue.  But that issue taken along with whatever
10   else the defense intends to show will enhance their
11   defense.
12              MR. SUPLEE:  But, your Honor, it's not really
13   probative one way or the other.  A company could decide
14   to enforce it, they could decide not to enforce it
15   whether they are using it or not using it.  And beyond,
16   that, with a jury trial, with a jury trial telling
17   people, telling the jurors that the plaintiff does not
18   practice the patent, the reaction, the typical guy on
19   the street, that's who we have in the jury box, I mean
20   guy in the generic sense, is going to think what is the
21   harm.  Then let these people do it.  And that is what
22   the Zenith case addresses, your Honor.
23              The appropriate focus here should be on the
24   patent and on their product.  And to try to get it in
25   that way -- Mr. Tillery says, he doesn't say, well, if I
```

00113

```
 1   add -- he says it's incredibly important.  It's
 2   incredibly important because it's incredibly
 3   prejudicial.
 4              MR. TILLERY:  We don't disagree with the law.
 5   He can certainly make that argument.  But he wants it
 6   the other way around.  He wants the impression to be
 7   left that this is some key product of Checkpoint.  It
 8   never has been and it never will be.  It's an nuisance
 9   patent.  And Lukas Geiges who was a Checkpoint employee
10   said that within Checkpoint it was referred to as a
11   nuisance patent, and that is what it is.
12              And you are entitled to argue that the law
13   does not require you to practice it.  That's fine.  And
14   I expect that you will do that.  But to deny us the
15   ability to tell the jury the truth, that no one on the
16   planet has ever made a product embodying this patent is
17   just wrong.
18              MR. SUPLEE:  There is no claim that anybody at
19   Checkpoint ever said to anybody at All-Tag this is a
20   nuisance patent.
21              And beyond that, your Honor, it just doesn't
22   have anything to do with the issue of equitable
23   estoppel.  And the main reason people want to get this
24   on the table, the reason we're fighting about this so
25   hard is because of the predictable effect on the jury.
```

00114

```
 1   That's the beginning and that's the end of it.
 2              And even if your Honor were to say that maybe
 3   it could be relevant, teamed with everything else, the
 4   Zenith case says no.
 5              THE COURT:  Okay.
 6              MR. BREINER:  Cross fire.  There are other
 7   reasons that's it's important as we outlined.  It goes
 8   to our inoperativeness defense, the fact that they don't
 9   practice it.  It goes to the commercial success on the
10   factor for obviousness.  It goes to the eBay factor if
11   they are successful in this case.  And I think to keep
12   it from the jury is just unfair.
13              The jurors can determine what is right and
14   what is wrong.  They can listen to your instructions as
15   to the law.  To keep out that nobody is using this
16   patent, including Checkpoint, I think would be
17   prejudicial to us.
18              MR. SUPLEE:  Well, how about we introduce the
19   evidence of what happened in the Swiss litigation and we
20   will let the jury sort it out because they are all so
21   smart.  You didn't let in --
22              Well, I don't need to tell you your job.
23              THE COURT:  Okay.  I will let you know first
24   thing in the morning.
25              MR. TILLERY:  Thank you, your Honor.
```

00115

```
 1              MR. BREINER:  Thank you, your Honor.
 2              MR. SUPLEE:  Thank you, your Honor.
 3              THE COURT:  Thank you.  Have a good evening.
 4              THE COURTROOM DEPUTY:  All rise.
 5                  (At 4:40 court was adjourned))
 6
 7
 8
 9
10
11
12
13
14
15                  CERTIFICATE
16
17              We certify that the foregoing transcript is a
18   true and accurate record of the proceedings in the
19   above-captioned matter.
20
21
22   Date              Nancy O'Neill
23
24   Date              Sidney Rothschild
25
```

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                      Day 2, 01/30/06

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHECKPOINT SYSTEMS, INC.,
         Plaintiff

vs.              Civil Action
                  01-2223
ALL-TAG SECURITY S.A.,
ALL-TAG SECURITY AMERICAS, INC.,
and SENSORMATIC ELECTRONICS CORP.,
         Defendants

Day 2 of Trial
January 30, 2007
Courtroom 9-B
Philadelphia, PA

Before THE HONORABLE PETRESE B. TUCKER, J.
and a Jury

APPEARANCES:

Dennis R. Suplee, Esq.        For the Plaintiff
Thomas W. Hazlett, Esq.
Robert A. McKinley, Esq.
SCHNADER HARRISON SEGAL
  & LEWIS LLP
1600 Market Street
Suite 3600
Philadelphia, PA  19103-7286

Nancy O'Neill
Suzanne White
Sidney Rothschild
Official Court Reporters
1234 U.S. Courthouse
601 Market Street
Philadelphia, PA  19106

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | Good morning.  You may be seated. |
| 3 | There are a couple of matters that were |
| 4 | unresolved when we broke yesterday.  One matter was the |
| 5 | matter of whether or not the court would permit certain |
| 6 | testimony in regard to the fact that Checkpoint does not |
| 7 | practice the patent.  The court will permit such |
| 8 | testimony, so that the attorneys can conduct themselves |
| 9 | accordingly. |
| 10 | On the issue of the motion to preclude |
| 11 | Checkpoint from mentioning All-Tag product number 1, is |
| 12 | there anything further on that?  Because the court is |
| 13 | prepared to resolve that motion? |
| 14 | MR. BREINER:  We don't have anything more, |
| 15 | your Honor. |
| 16 | THE COURT:  The court will deny that motion. |
| 17 | I have passed out some proposed preliminary |
| 18 | instructions to the jury.  The instructions, while given |
| 19 | to you in a packet, will not necessarily be given to the |
| 20 | jurors in that fashion.  They will be given a little |
| 21 | differently, but substantively those are the |
| 22 | instructions that will be given to the jury. |
| 23 | Do we have any questions or comments about the |
| 24 | instructions? |
| 25 | MR. SUPLEE:  Your Honor, plaintiff has some |

Page 4

APPEARANCES:  (cont'd)

Theodore A. Breiner, Esq.       For All-Tag
Jennifer A. Harchick, Esq.
BREINER & BREINER, LLC
115 North Henry Street
Alexandria, VA  22314

Tracy Zurzolo Quinn, Esq.
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

M. Kelly Tillery, Esq.        For Sensormatic
Erik N. Videlock, Esq.
Jeffrey A. Toll, Esq.
PEPPER HAMILTON, LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA  19103-2799

| | |
|---|---|
| 1 | comments with respect to page 10. |
| 2 | THE COURT:  Okay. |
| 3 | MR. SUPLEE:  And starting from the bottom, we |
| 4 | would suggest that the very last paragraph be deleted |
| 5 | because the issue of correction is for the court and not |
| 6 | for the jury.  And I had understood that would be |
| 7 | handled by the court at the conclusion of the trial by |
| 8 | the jury. |
| 9 | THE COURT:  Okay. |
| 10 | MR. SUPLEE:  The only other suggestion, your |
| 11 | Honor, is in the very first paragraph on the same page, |
| 12 | and the second sentence begins, a patent may be invalid |
| 13 | due to obviousness, and then we suggest that the words |
| 14 | "lack of" be added, lack of enablement, and change |
| 15 | inoperability to or operability.  So the lack of |
| 16 | enablement or operability, and before the word |
| 17 | inventorship insert the word inaccurate. |
| 18 | Should I go through that again, your Honor? |
| 19 | THE COURT:  Lack of enablement -- |
| 20 | MR. SUPLEE:  -- or operability.  So instead of |
| 21 | inoperability, and inaccurate inventorship. |
| 22 | MR. TILLERY:  Your Honor, I concur with that |
| 23 | except for inoperability is actually the word that's |
| 24 | used in the case law, and they are different things.  So |
| 25 | you are talking about obviousness, lack of enablement, |

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                    Day 2, 01/30/06

Page 215

1    A.      JUST TO MAKE IT ABSOLUTELY CLEAR THAT IT WAS A
2    THROUGHHOLE, I WAS ABLE TO PASS SOME WATER THROUGH THE
3    HOLE THROUGH THE LABEL, AND I MADE A LITTLE VIDEO OF
4    THAT TO HAVE ABSOLUTE PROOF THAT THERE WAS A
5    THROUGHHOLE.
6    Q.      WHAT ELSE DID YOU DO?
7    A.      OKAY.  I RECEIVED A VIDEO OF THE ALL-TAG
8    MANUFACTURING PROCESS AND I VIEWED THAT.
9    Q.      CAN I USE THE ABBREVIATION MFG FOR
10   MANUFACTURING?
11   A.      THAT IS FINE WITH ME.
12           WITHIN THAT VIDEO, THEY TALK ABOUT THE
13   PROCESS TO CREATE THE DESIRED AIR GAP WITHIN THAT VIDEO.
14   Q.      IN CASE YOU DID NOT SAY IT YET, I DON'T WANT TO
15   SAY YOU DID, DID YOU LOOK AT ANY U.S. PATENTS?
16   A.      YES.  WE DID MENTION THAT I LOOKED AT THE '466
17   AND THE '343 PATENTS THAT DESCRIBED THE ALL-TAG
18   MANUFACTURING PROCESS.
19   Q.      THAT IS SEVEN.  AND YOU REFERRED TO A FEW
20   STATEMENTS EARLIER TODAY.  DO YOU RECALL WHAT THOSE
21   STATEMENTS WERE?
22   A.      YES, THERE WAS THE PICHL STATEMENT, THE HOLT
23   STATEMENT AND THE ITC DETERMINATION THAT ALL INCLUDED
24   INFORMATION ABOUT THE ALL-TAG MANUFACTURING PROCESS.
25   Q.      NOW, DR. ZAHN, DID YOU NEED TO LOOK AT ALL OF

Page 216

1    THESE TO COME TO YOUR CONCLUSIONS?
2    A.      EACH ONE REINFORCED THE OTHER.  WE ONLY NEEDED
3    ONE PROOF THAT THERE WAS A THROUGHHOLE THAT WAS A MEANS
4    FOR DEACTIVATION OF THE TAG.  I DID IT 10 TIMES OVER AND
5    EACH OF THESE CASES VERIFIED THAT THAT WAS THE CASE IN
6    THE ALL-TAG TAGS.
7    Q.      YOU REFERRED TO THE PICHL STATEMENT.  DO YOU
8    REMEMBER WHO IS PICHL?
9    A.      WELL, HE WAS THE REPRESENTATIVE FROM ALL-TAG.
10   Q.      DO YOU KNOW FROM READING THIS, THE HOLT
11   STATEMENT, DO YOU KNOW WHO HE WAS?
12   A.      I DON'T RECALL HIS RANK BUT HE WAS ALSO AN
13   EXPERT FROM ALL-TAG.
14   Q.      ALL RIGHT, DR. ZAHN --
15           THE COURT:  ARE YOU MOVING ON TO A
16   DIFFERENT AREA?
17           MR. MCKINLEY:  YES, YOUR HONOR.  I WAS
18   GOING TO GO DOWN EACH ONE OF THOSE ELEMENTS IN DETAIL.
19           THE COURT:  I THINK THIS WOULD BE AN
20   APPROPRIATE TIME TO RECESS UNTIL TOMORROW MORNING.  WE
21   WILL RECESS UNTIL NINE O'CLOCK TOMORROW MORNING.
22           MR. MCKINLEY:  THANK YOU.
23           (JURY OUT.)
24           THE COURT:  OKAY.  YOU MAY BE SEATED.  WE
25   WILL RECESS UNTIL TOMORROW MORNING AT NINE O'CLOCK.  IS

Page 217

1    THERE ANYTHING THAT WE NEED TO PUT ON THE RECORD BEFORE
2    WE RECESS?
3            MR. BREINER:  JUST ONE HOUSEKEEPING
4    MATTER.  OUR LEGAL EXPERT, CARL JORDA, CALLED ME SUNDAY
5    NIGHT AND ADVISED THAT HE IS ILL.  WE ARE GOING TO
6    SUBSTITUTE ANOTHER LEGAL EXPERT, MR. JAMES LABARRE.  I
7    HAVE TALKED TO COUNSEL FOR CHECKPOINT.  I DON'T BELIEVE
8    THEY HAVE AN OBJECTION, BUT I WANTED TO INFORM THE COURT
9    AND MAKE SURE THAT WAS ACCEPTABLE.
10           MR. SUPLEE:  I THINK WE ARE PRETTY MUCH
11   OKAY ON THIS, YOUR HONOR.  WE DO NOT OBJECT TO THE
12   SUBSTITUTION SO LONG AS THE WITNESS WHO WILL APPEAR WILL
13   SAY NOTHING MORE THAN WHAT JORDA WOULD HAVE SAID.  I
14   GUESS THAT GOES WITHOUT SAYING.
15           THE SECOND THING IS, WE HAD A SCHEDULING
16   ISSUE ON OUR SIDE AS WELL THAT WE HAVE RAISED WITH THE
17   OTHER SIDE AND THAT IS, MR. DOWD IS AVAILABLE THIS WEEK
18   BUT NOT NEXT WEEK.  AND SO THOUGH I WOULD NORMALLY CALL
19   HIM PROBABLY ON REBUTTAL BECAUSE WHAT HE WILL BE TALKING
20   ABOUT IS A MEETING IN 1999 WITH FOLKS FROM ALL-TAG, WE
21   WOULD LIKE TO CALL HIM AT THE END OF OUR CASE-IN-CHIEF.
22   AND MY UNDERSTANDING IS THAT DEFENDANTS DO NOT OBJECT TO
23   THAT, THOUGH THEY WANT AN OFFER OF PROOF.  I HAVE SAID
24   WE HAVE ALREADY GIVEN THAT STATEMENT THAT WAS PROVIDED
25   TO THE COURT IS WHAT THE MAN WILL SAY.  HE IS NOT GOING

Page 218

1    TO SAY ANYTHING MORE NOW THAN HE WOULD HAVE SAID IF HE
2    WERE CALLED LATER ON.
3            MR. BREINER:  YOUR HONOR, AS YOU RECALL,
4    MR. DOWD WAS THE INDIVIDUAL WHO WAS NOT LISTED.  I DON'T
5    RECALL THE OFFER OF PROOF BUT I THINK THAT SHOULD BE
6    ACCEPTABLE.  IF WE HAVE A PROBLEM, WE WILL LET THEM
7    KNOW.
8            THE COURT:  OKAY.
9            MR. TILLERY:  MAY WE HAVE JUST AN
10   INDICATION WHERE THAT OFFER OF PROOF IS?  I DON'T RECALL
11   THAT EITHER.  IS IT JUST GOING TO BE THE SUMMER MEETING,
12   IS THAT IT?
13           MR. SUPLEE:  WELL, I'M --
14           MR. TILLERY:  I JUST DON'T RECALL GETTING
15   THAT, MR. SUPLEE.
16           MR. SUPLEE:  WELL, I WILL TELL YOU WHAT I
17   WILL DO.  WHETHER WE SENT IT BEFORE OR WE DIDN'T SEND IT
18   BEFORE, WE WILL SEND IT AT THE END OF THE DAY SO THERE
19   WON'T BE ANY ISSUE ABOUT IT.
20           MR. TILLERY:  THAT IS FINE, YOUR HONOR.
21   WE WILL TAKE A LOOK AT IT.  I DON'T THINK THERE WILL BE
22   A PROBLEM.
23           THE COURT:  ANYTHING ELSE?
24           MR. BREINER:  NO, YOUR HONOR.
25           MR. SUPLEE:  YOU WANT US AT 9, YOUR

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                     Day 2, 01/30/06

Page 219

1    HONOR?
2            THE COURT:  YES.  I THINK THE SOONER WE
3    GET STARTED, THE SOONER WE FINISH.
4            MR. SUPLEE:  THAT IS WHAT THEY SAY.
5            MR. TILLERY:  WE ARE MAKING REAL
6    PROGRESS.  WE ARE MOVING RIGHT ALONG.
7            MR. SUPLEE:  BY THE WAY, DOWD CAN BE HERE
8    THURSDAY OR FRIDAY.  TOMORROW IS WEDNESDAY, I DON'T
9    THINK WE WOULD -- I DON'T KNOW MAYBE WE WILL FINISH OUR
10   CASE ANYWAY.  WE NEED TO TAKE DOWD INTO THE NEXT MORNING
11   THEN.
12           THE COURT:  ALL RIGHT.  HAVE A GOOD
13   EVENING.  SEE YOU IN THE MORNING AT NINE O'CLOCK.
14           ALL COUNSEL:  THANK YOU, YOUR HONOR.
15
16
17           WE CERTIFY THAT THE FOREGOING IS A
18   CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
19   ABOVE-ENTITLED MATTER.
20
21   DATE           OFFICIAL COURT REPORTER
22
23   DATE           OFFICIAL COURT REPORTER
24
25   DATE           OFFICIAL COURT REPORTER

Page 220

1            INDEX
2    OPENING STATEMENTS          PAGE
3
4    BY MR. SUPLEE           26
5    BY MS QUINN             67
6    BY MR. TILLERY          83
7
8    WITNESS       DIRECT  CROSS  REDIRECT  RECROSS
9    MICHAEL DUNNAM     117   148    --     --
10   DAVID MCGOLDRICK   173   178    188    --
11   MARKUS ZAHN        189    --    --     --
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ProTEXT Transcript Condensing for Windows

SHEET 1   PAGE 1

```
00001
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
3
     CHECKPOINT SYSTEMS, INC.,
4              Plaintiff
5
          vs.                   Civil Action
6                               01-2223
7    ALL-TAG SECURITY S.A.,
     ALL-TAG SECURITY AMERICAS, INC.,
8    and SENSORMATIC ELECTRONICS CORP.,
               Defendants
9
10                             Day 3 of Trial
                               January 31, 2007
11                             Courtroom 9-B
12                             Philadelphia, PA
13        Before THE HONORABLE PETRESE B. TUCKER, J.
                   and a Jury
14
15
     APPEARANCES:
16
17   Dennis R. Suplee, Esq.       For the Plaintiff
     Thomas W. Hazlett, Esq.
18   Robert A. McKinley, Esq.
     SCHNADER HARRISON SEGAL
19       & LEWIS LLP
     1600 Market Street
20   Suite 3600
     Philadelphia, PA  19103-7286
21
22             Nancy O'Neill
               Suzanne White
23             Sidney Rothschild
          Official Court Reporters
24        1234 U.S. Courthouse
          601 Market Street
25        Philadelphia, PA  19106
```

PAGE 2

```
00002
1
2    APPEARANCES:  (cont'd)
3    Theodore A. Breiner, Esq.     For All-Tag
     Jennifer A. Pulsinelli, Esq.
     BREINER & BREINER, LLC
4    115 North Henry Street
     Alexandria, VA  22314
5
6
7    Tracy Zurzolo Quinn, Esq.
     REED SMITH, LLP
     2500 One Liberty Place
8    1650 Market Street
     Philadelphia, PA  19103
9
10
     M. Kelly Tillery, Esq.       For Sensormatic
11   Erik N. Videlock, Esq.
     Jeffrey A. Toll, Esq.
12   PEPPER HAMILTON, LLP
     3000 Two Logan Square
13   18th and Arch Streets
     Philadelphia, PA  19103-2799
14
15
16
17
18
19
20
21
22
23
24
25
```

PAGE 3

```
00003
1                    PROCEEDINGS
2         MS. QUINN:  I understand the plaintiff is
3    going to call Mr. Olivier Boels from All-Tag as on cross
4    in their case in chief, which is fine.  I don't know
5    what they intend to ask him.  All I want to be certain
6    of is that whatever topics they cover with him we will
7    still be free to cover in our case in chief, that is, we
8    don't have to address the entire subject matter in the
9    plaintiff's.
10        THE COURT:  No, you don't.
11        MR. SUPLEE:  Just one other question if I may.
12   In this type of case, would the court's practice be to
13   let the jurors take their notes into deliberations?
14        THE COURT:  Yes.
15        MR. SUPLEE:  Okay.
16        (At 9:15 the jury entered the courtroom.)
17        THE COURT:  Good moring, ladies and gentlemen.
18   You may be seated.
19        Counsel.
20        MR. McKINLEY:  Thank you, your Honor.
21             DIRECT EXAMINATION (cont')
22   BY MR. McKINLEY:
23   Q    Good morning, Dr. Zahn.
24   A    Good morning.
25   Q    Just by way of a brief recapitulation of the events
```

PAGE 4

```
00004
1    of yesterday to get us started today.  Do you recall
2    that the defendants have agreed that the All-Tag labels
3    have the first three elements of claim 1 and claim 15?
4    A    That's correct.
5    Q    So the focus of your testimony today, what I would
6    like to focus on is the fourth and final element of
7    claims 1 and 15 in the '555 patent.
8    A    Yes, sir.
9    Q    Now, yesterday, you told us that there is no
10   difference in the label that results from the
11   manufacturing process in place before 2001 as opposed to
12   the one that was in place after 2001, is that correct?
13   A    That's correct.
14   Q    Do you hold that opinion, Dr. Zahn, to a reasonable
15   scientific certainty?
16   A    Yes, and beyond that.  It's very evident that they
17   are identical in function.
18   Q    And you also told us that the All-Tag labels had
19   all of the elements in claims 1 and 15.  Do you hold
20   that opinion to a reasonable degree of scientific
21   certainty?
22   A    Yes.
23   Q    Now, we ended the day yesterday with you listing
24   out for the jury and the court the ten items that you
25   looked at in forming the conclusions that you're
```

ProTEXT Transcript Condensing for Windows

SHEET 2   PAGE 5

00005

1  testifying about today and have just so stated.
2          What I would like to do now is go through each
3  one of those in order and talk about what you did.
4          So, first, now that we have our list, we are
5  going to work through it.  So let's discuss the tests
6  you say you conducted on All-Tag RF labels.  First, Dr.
7  Zahn, where did you get the All-Tag labels that you
8  tested?
9  A    I received them from a Checkpoint attorney, James
10 Cashel.
11 Q    And was Mr. Cashel outside counsel for Checkpoint
12 or did he work for Checkpoint, do you know?
13 A    I believe he was an outside counsel.
14 Q    When did you receive those tags?
15 A    Around February of 2004.
16 Q    And in what form were they when you received them?
17 A    I received a roll of All-Tag labels, a roll of
18 1,000 tags approximately.  And then a few extra loose
19 ones of different sizes.
20 Q    Can I please have plaintiff's exhibit 237.
21         MR. McKINLEY:  Your Honor, may I approach the
22 witness?
23         THE COURT:  Yes.
24 BY MR. McKINLEY:
25 Q    Dr. Zahn, I hand to you what the envelope in any

PAGE 6

00006

1  event will be marked plaintiff's exhibit 237.  What is
2  this?
3  A    This is the roll of approximately a thousand
4  All-Tag labels that I received.  It's short a few from
5  the thousand because I took some for my testing.
6  Q    Was there anything attached to that roll?
7  A    Here are some other tags at the leading end of the
8  roll that I had taken off and the identifying label that
9  says these are All-Tag deactivatable 4 by 4 tags.
10 Q    Since you received this roll from Mr. Cashel, and
11 putting aside when you provided it to counsel for the
12 court, has it been in your possession, custody or
13 control up until today?
14 A    A hundred percent of the time.
15         MR. McKINLEY:  I move plaintiff's exhibit 237
16 into evidence and ask permission to publish it to the
17 jury?
18         MR. BREINER:  We object on authenticity and
19 lack of foundation.
20         THE COURT:  Overruled.  It will be admitted.
21         MR. McKINLEY:  May I approach the witness and
22 get the labels back?
23         THE COURT:  Yes.
24         MR. McKINLEY:  And your Honor, I ask
25 permission if I may pass these around to the jury so

PAGE 7

00007

1  they can take a look at them?
2          THE COURT:  Yes.
3              (Exhibit passed to the jury)
4  BY MR. McKINLEY:
5  Q    Putting aside what you were told about what these
6  labels were when they were presented to you, Dr. Zahn,
7  how do you know that they were All-Tag labels other than
8  you had mentioned the tag, is there any other way you
9  knew?
10 A    Well, you notice that tags have a serial number on
11 them, the 048572020000.  And when I went to the All-Tag
12 website just to see what their product line was like,
13 they had this exact same serial number on their website.
14 Q    Can you back up to a full zoom, please.
15         And this plaintiff's exhibit 235 that I have
16 put up, Dr. Zahn, what is that?
17 A    This is a page off the All-Tag website.
18 Q    Did you visit the All-Tag website and see the page?
19 A    Yes, I did.
20 Q    When was the last time you saw it?
21 A    Yesterday.
22         MR. McKINLEY:  I move plaintiff's exhibit 235
23 into evidence, your Honor.
24         THE COURT:  Yes.
25 BY MR. McKINLEY:

PAGE 8

00008

1  Q    May I please have plaintiff's exhibits 236 and 238
2  through 244.
3          Your Honor, may I approach?
4          THE COURT:  Yes.
5  BY MR. McKINLEY:
6  Q    Dr. Zahn, starting with exhibit plaintiff's exhibit
7  236, can you tell me what that is?
8  A    These are the samples that I had processed and
9  examined from the All-Tag labels that I had received.
10 They are in these envelopes.
11 Q    And when you say processed, Dr. Zahn, what do you
12 mean by that term?
13 A    Well, since the main issue here is a throughhole
14 for the dielectric layer and the tags are covered with
15 both paper and aluminum, you can't visually see the
16 dielectric layer or the throughhole in its -- in its
17 full form.  So I had to remove the paper and I had to
18 remove the aluminum to get down to the dielectric layer
19 so I can view it by either an optical microscope or an
20 electron microscope.
21 Q    And can you remove one of the labels, please, and
22 and hold it up.
23 A    I'm looking at the Checkpoint sample number 1.
24 Q    I'm sorry, Dr. Zahn, did you say Checkpoint sample
25 number 1?

ProTEXT Transcript Condensing for Windows

00009

```
 1   A    I'm sorry.  I have got the envelope is labeled
 2   Checkpoint, but it is sample number 1 from All-Tag.
 3   Thank you.
 4            And I put the sample on these yellow Post-its.
 5   One, because the Post-its protect them by being put in
 6   the envelope.  I can remove the Post-it from the
 7   envelope rather than the sample.  The sample itself is
 8   small and tends to adhere to surfaces.  And also I can
 9   label the Post-it with the sample numbers.  Since all
10   the samples look alike, I make sure to never take more
11   than one at a time out of the envelope.  And the
12   identifying number is on the Post-It.  But if you sort
13   of bend the Post-It, you can take the sample off.  So
14   here is sample number 1 of my testing.  And this is just
15   of the dielectric layer.
16   Q    And the envelope that you took that tag from, that
17   sample, can you read the designation on the envelope,
18   sample 1, is there any other identifying information
19   there?
20   A    It's dated 3-23-04 and it's 4 by 4-d.  The 4 by 4-d
21   matches the description.  These are 4 centimeter by 4
22   centimeter dimension tags.  The d means they are
23   deactivatable.  And the 3-23-04 is the date that I first
24   would have put this in the envelope.
25   Q    Is there a designation with the letter d on the
```

00010

```
 1   envelope that was placed by counsel from your
 2   deposition?
 3   A    Yes.  There is a tag and exhibit number and it's
 4   D-82.  It has a date of 6-23-06.  Has some initials.  I
 5   think it's BL.
 6   Q    And, Dr. Zahn, I think you said that in your
 7   processing you had removed some of the other layers.
 8   Yesterday you recall that we looked at several figures
 9   that had a top conducting layer, a middle dielectric
10   layer and a bottom conducting layer.  Which layer is
11   that that you have there in your sample?
12   A    That's the middle dielectric layer.
13   Q    Before we go any further.  When you did your
14   processing -- and we'll get into the details of how you
15   removed those metal layers -- when did you place the
16   samples on the yellow Post-its?
17   A    Well, it would be approximately after I had done my
18   optical microscope measurements which were approximately
19   March of 2004.
20   Q    So it was never placed on a Post-It before you
21   examined the tags, is that right?
22   A    I don't believe so.  I think it was done after.
23   Q    And the next tag in that exhibit, plaintiff's --
24   A    I'm going to put this one back because I never take
25   out more than one at a time.
```

00011

```
 1   Q    What is the next tag in plaintiff's exhibit 236?
 2   A    It's what my labeling is sample #2.
 3   Q    And does it have any other identifying information
 4   on the outside of the envelope?
 5   A    Well, it has exhibit numbered D-83.  It has
 6   initials perhaps RC or RL dated 6-23-06.
 7   Q    Okay.  Before you take that sample out, Dr. Zahn,
 8   the first sample you showed us, did that come from that
 9   roll that we just looked at, plaintiff's exhibit 237?
10   A    Yes, it did.
11   Q    And this sample, the sample 2, did that also come
12   from that roll 237?
13   A    Yes, it did.
14   Q    Not to belabor the point of having you take each
15   one out of the envelope, Dr. Zahn, were all the labels
16   -- if you can just tick through all the labels in that
17   stack, were they all processed and do they all look
18   similar to the label that you did take out?
19   A    Well, some of them I didn't process, and I would
20   have to go to, for example, my expert report identifies
21   exactly what was done to each and every label.  Most
22   were processed down to the dielectric layer, but not
23   every single one was.
24   Q    If you can take out sample 2, and let me know if
25   that was processed down to the dielectric layer.
```

00012

```
 1   A    Here is sample #2 (indicating), and it was
 2   processed down to the dielectric layer.
 3   Q    Okay.  Can you place that back in the envelope,
 4   please.
 5            And what is the next sample in plaintiff's
 6   exhibit 236?
 7   A    It is sample number 3, exhibit D-84.
 8   Q    And did you process that label down to the
 9   dielectric layer?
10   A    It is somewhat tenacious.  And sample number 3 was
11   processed down to the dielectric layer.
12   Q    You can put that back in the envelope, please.
13   That's D-84.
14            And what is the next sample in plaintiff's
15   exhibit 237.
16   A    Sample number 4.  Exhibit number D-85.
17   Q    Did you process that label down to the dielectric
18   layer?
19   A    Yes, I did.  There is the thin film, and it's
20   processed down to the dielectric layer.
21   Q    Dr. Zahn, you stated earlier with respect to D-82
22   which is in plaintiff's exhibit 236 that that sample
23   came from the roll of tags that we passed around the
24   jury.  How many samples did you take off that roll to
25   process?
```

ProTEXT Transcript Condensing for Windows

00013

1  A   I believe on the first time it was 17.
2  Q   The four that you mentioned, samples 1, 2, 3 and 4
3  -- -- let me ask you this, doctor.  Did you label the
4  samples, the 17 samples, sample 1 through sample 17?
5  A   Yes, I did.
6  Q   So the samples that have that designation on them,
7  sample 1, 2, all the way up to sample 17 will have come
8  from that roll that we looked at?
9  A   That's correct.
10 Q   What is the next sample, Dr. Zahn?
11 A   Sample #5.
12 Q   And although it's in plaintiff's exhibit 236,
13 sample #5, does it have any other designation?
14 A   The exhibit number D-86.  Now, this one is
15 different.
16 Q   And how is it different, Dr. Zahn?
17 A   This one was used for measurements in the scanning
18 electron microscope which requires it to be gold coated
19 with something like a 10 nanometer thin gold film on it
20 for proper operation with the electron microscope.
21 Q   And before we get into those details, I want to be
22 clear.  When you say it's different, what do you mean by
23 that?
24 A   That it's gold coated.
25 Q   Was the tag also a tag taken off the roll 237?

00014

1  A   Yes.
2  Q   So it's no different than the other tags; you are
3  speaking of a difference in the way you used the tag to
4  study it?
5  A   That's correct.
6  Q   We are going to discuss sample 5 a little bit
7  later.
8          How many more samples are in plaintiff's
9  exhibit 236, Dr. Zahn?
10 A   Well, they go up --
11 Q   Better yet, if you can just recite for the record
12 the sample numbers and just click through them.
13 A   Okay.  So we have already looked at samples one
14 through five.  Shall I read the sample number and the
15 exhibit number?
16 Q   Yes.
17 A   So I have sample 6, exhibit D-88; sample 7, exhibit
18 number D-89; sample 8, exhibit number D-90; sample 9,
19 exhibit number D-91; sample 10, exhibit number D-92;
20 sample 11, exhibit D-93; sample 12, exhibit
21 number D-94; sample number 13, exhibit number D-95;
22 sample number 14, exhibit D-96; and sample number 16,
23 exhibit D-97; and sample 16 and 17 together in
24 one envelope, exhibit number D-87.
25 Q   So that it would be fair to say that plaintiff's

00015

1  exhibit 236 contains the 17 samples that you processed
2  that came off of the roll from plaintiff's exhibit 237,
3  is that right?
4  A   Samples 16 and 17 were intact tags, so they were
5  not processed down to the dielectric layer.
6  Q   And why did you -- why were 16 and 17 not processed
7  down to the dielectric layer?
8  A   Because I wanted to have a comparison with them
9  intact and where I was able to look down to the
10 dielectric layer, so I had some of each type.
11 Q   Okay.  So sample 16 and 17, if you can take those
12 out, please.
13 A   Yes.
14 Q   Okay.  And they were -- I'm sorry, Dr. Zahn, can
15 you describe those samples again for me.
16 A   Sample 16 was not gold coated.  Sample 17 was gold
17 coated.
18 Q   For purposes of your processing and observation?
19 A   Yes.
20 Q   You can place those back in the envelope, please.
21         I move plaintiff's exhibit 236 into evidence.
22         MR. BREINER:  Same objection as before, lack
23 of foundation.
24         THE COURT:  Overruled.  They will be admitted
25 into evidence.

00016

1          MR. McKINLEY:  I'm sorry?
2          THE COURT:  They will be admitted into
3  evidence.
4          MR. McKINLEY:  Thank you.
5          THE COURT:  Sure.
6  BY MR. McKINLEY:
7  Q   Dr. Zahn, can you describe what you did -- you
8  showed us about four or five samples, and I think you
9  said there're others.  What did you do specifically to
10 process these labels down to the dielectric layer?
11 A   Okay.  So they were done one at a time.  So I would
12 take one label.  You can peel them off the translucent
13 paper with no problem at all.  But they would remain
14 sticky.  In the usual practical application, they would
15 stick to some object or merchandise.  But they were hard
16 to deal with when they were sticky because they would
17 attach to anything.  And then on the other side, on the
18 back side was where the serial number was on, and that
19 paper you could not remove with your fingers alone.  It
20 was very sticky.
21         So I used ethyl acetate which basically
22 dissolves adhesive and put it into a beaker and let it
23 sit for about five minutes or so.  And what would happen
24 is the paper would just lift off and float to the top.
25 So that made that very easy.  And it would also remove

ProTEXT Transcript Condensing for Windows

SHEET 9   PAGE 33

```
00142
 1                THE COURT:  Okay, you may be seated.
 2                Are there any issues that we need to talk
 3   about before we recess until tomorrow morning?
 4                MR. SUPLEE:  Not from the plaintiff, Your
 5   Honor.
 6                MS. QUINN:  Nor us, Your Honor.
 7                THE COURT:  All right.  Well, have a good
 8   evening.  I will see you tomorrow morning at 9:00.
 9                (Court adjourned at 3:00 pm.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PAGE 34

```
00143
 1                      INDEX
 2   WITNESS           DIRECT  CROSS  REDIRECT  RECROSS
 3   MARKUS ZAHN
 4   (CONTINUED DIRECT)   3      78
 5   OLIVIER BOELS       96     124
 6   DEPOSITION EXCERPTS OF
 7   HUBERT PATTERSON    113
 8   NEIL AUSTIN         119
 9
10
11
12
13
14
15
16                WE CERTIFY THAT THE FOREGOING IS A
17   CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
18   ABOVE-ENTITLED MATTER.
19
20   DATE                    OFFICIAL COURT REPORTER
21
22   DATE                    OFFICIAL COURT REPORTER
23
24   DATE                    OFFICIAL COURT REPORTER
25
```

ProTEXT Transcript Condensing for Windows

SHEET 1   PAGE 1

```
0001
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3

   CHECKPOINT SYSTEMS, INC.,
 4            Plaintiff
 5
            vs.                    Civil Action
 6                                 01-2223
 7 ALL-TAG SECURITY S.A.,
   ALL-TAG SECURITY AMERICAS, INC.,
 8 and SENSORMATIC ELECTRONICS CORP.,
            Defendants
 9
                                  Day 4 of Trial
10                                February 1, 2007
                                  Courtroom 9-B
11                                Philadelphia, PA
12
   ─────────────────────────────────
13      Before THE HONORABLE PETRESE B. TUCKER, J.
                  and a Jury
14
   ─────────────────────────────────
15
   APPEARANCES:
16
```

PAGE 2

```
17 Dennis R. Suplee, Esq.         For the Plaintiff
   Thomas W. Hazlett, Esq.
18 Robert A. McKinley, Esq.
   SCHNADER HARRISON SEGAL
19    & LEWIS LLP
   1600 Market Street
20 Suite 3600
   Philadelphia, PA  19103-7286
21
22              Nancy O'Neill
                Suzanne White
23            Sidney Rothschild
            Official Court Reporters
24          1234 U.S. Courthouse
              601 Market Street
25          Philadelphia, PA  19106
0002
 1 APPEARANCES:  (cont'd)
 2
   Theodore A. Breiner, Esq.       For All-Tag
 3 Jennifer A. Harchick, Esq.
   BREINER & BREINER, LLC
 4 115 North Henry Street
   Alexandria, VA   22314
 5
 6
```

PAGE 3

```
 7 Tracy Zurzolo Quinn, Esq.
   REED SMITH, LLP
   2500 One Liberty Place
 8 1650 Market Street
   Philadelphia, PA  19103
 9
10
   M. Kelly Tillery, Esq.          For Sensormatic
11 Erik N. Videlock, Esq.
   PEPPER HAMILTON, LLP
12 3000 Two Logan Square
   18th and Arch Streets
13 Philadelphia, PA  19103-2799
14
15
16
17
18
19
20
21
22
23
24
25
0003
```

PAGE 4

```
 1                    PROCEEDINGS
 2        THE COURT:  Good morning.  You may be
 3 seated.
 4        Are we ready for the jury?
 5        MR. SUPLEE:  We are, your Honor.
 6        (At 9:20 a.m, the jury entered the courtroom.)
 7        THE COURT:  You may be seated.  Good morning,
 8 ladies and gentlemen.
 9        MR. HAZLETT:  Your Honor, with the court's
10 permission, Checkpoint would like to call Kevin Dowd now
11 rather than in our rebuttal case because Mr. Dowd is not
12 available next week.
13        THE COURT:  You may.
14             KEVIN DOWD, sworn
15           DIRECT EXAMINATION
16 BY MR. HAZLETT:
17 Q   Good morning, Mr. Dowd.
18 A   Good morning.
19 Q   Would you tell the jury where you went to college.
20 A   Mount Saint Mary's College.
21 Q   And when did you graduate from Mount Saint Mary's?
22 A   1970.
23 Q   What was your degree in at Mount Saint Mary's?
24 A   Political science.
25 Q   Did you go to any graduate school after you
0004
```

ProTEXT Transcript Condensing for Windows

0052
```
 1  at in particular, paragraphs 69 and 730.
 2          If you can zoom in on those, please.
 3          Paragraph 69, you see it says:  In
 4  January 1993, at the National Retail Federation show
 5  in New York, New York, Olivier Boels, who is All-Tag's
 6  director of international sales brought with him from
 7  Switzerland All-Tag deactivable resonant tags and
 8  showed a sample of the tag to Kevin P. Dowd, you,
 9  Checkpoint's executive vice president?
10  A.  Yes.
11  Q.  That was what you were talking about before, your
12  meeting with Mr. Boels?
13  A.  Yes.
14  Q.  A few months later.  In paragraph 70.  In
15  August 1993 Checkpoint placed an order through Customs
16  Securities Industry, Inc. CSI located in Canada for
17  23,000 deactivable resonant tags from All-Tag in
18  Switzerland, you see that?
19  A.  Yes.
20  Q.  CSI obtained the accused products from All-Tag and
21  CSI filled Checkpoint's order by importing into the
22  United States, 23,000 All-Tag deactivable resonant
23  tags on or about August 19th of 1992, you see that?
24  A.  Yes.
25  Q.  Sometime after that, Checkpoint filed this lawsuit
```

0053
```
 1  in the ITC?
 2  A.    Yes.
 3  Q.  So the fact that All-Tag was only selling in your
 4  view a relatively small number of tags in the early
 5  '90s, didn't stop Checkpoint from suing All-Tag at
 6  that time?
 7  A.  Yes.
 8          MS. QUINN:  Thank you.
 9          MR. TILLERY:  Nothing further, your Honor.
10          THE COURT:  Okay.
11          MR. HAZLETT:  Nothing further with this
12  witness, sir.
13          THE COURT:  Thank you.
14          THE WITNESS:  Thank you, your Honor.
15          (Witness leaves the witness stand.
16          MR. HAZLETT:  Jut tying up a couple of loose
17  ends.
18          First we would like to mark the copy of the
19  patent that the Court distributed on Monday as
20  plaintiff's exhibit 317 and move that into evidence.
21          THE COURT:  Yes.
22          MR. HAZLETT:  I think it was yesterday during
23  Dr. Zahn's testimony we looked at Plaintiff's
24  Exhibit 25, which is the All-Tag defendant's responses
25  to plaintiff's first set of admissions.
```

0054
```
 1          We would like to also move that into
 2  evidence.
 3          THE COURT:  Yes.
 4          MR. TILLERY:  Which number?
 5          MR. HAZLETT:  Plaintiff's Exhibit 25.
 6          MR. TILLERY:  Give us a moment to respond.
 7          MR. HAZLETT:  I'll turn things over to Mr.
 8  Suplee.
 9          MR. TILLERY:  No objection, your Honor.
10          THE COURT:  P-25 will be admitted.
11          MR. SUPLEE:  With that, Judge Tucker,
12  Plaintiff Checkpoint rests.
13          THE COURT:  Okay.
14          We will take a brief recess for the jurors.
15          (Jury leaves the courtroom.)
16          THE COURT:  You may be seated.  We have
17  something to put on the record before we proceed?
18          MS. QUINN:  Your Honor, at this time we would
19  like to move pursuant to Rule 50 for directed verdict
20  as to plaintiff's claim for infringement for products
21  made after April of 2001, we have been referring to
22  its product as process two.
23          MR. TILLERY:  We join in the motion in that
24  motion, in particular, refer the Court again to the
25  Shertec case, which we believe well establishes that
```

0055
```
 1  an expert must in fact actually examine a product upon
 2  which he or she is opining.  Since Dr. Zahn admittedly
 3  did not examine the product two, which was made after
 4  April of 2001, his testimony is insufficient to
 5  support a claim and therefore we should get a directed
 6  verdict on that.
 7          We also like to renew our motion for summary
 8  judgment, equitable estoppel, latches and waiver, at
 9  this time.  And, we submit there are no material
10  issues of fact remaining under the circumstances of
11  what plaintiffs have presented here.
12          MS. QUINN:  We join in that motion as well.
13          MR. SUPLEE:  Your Honor, very briefly I think
14  Dr. Zahn's testimony with respect to the patent and
15  process used after 2001 was more than adequate to
16  satisfy the rules.
17          The Shertec case really has nothing to do
18  with the present situation.  The problem with the
19  Shertec case, the fact it was not clear in that case
20  that the product was manufactured in accordance with
21  what the patent said.  Here the testimony is clear
22  that the defendants say that the patent says what it
23  says and Dr. Zahn's testimony, I submit is more than
24  adequate.  I think it was overwhelmingly convincing.
25          With respect to summary judgment on the
```

ProTEXT Transcript Condensing for Windows

SHEET 8   PAGE 29

```
0056
 1  defenses.  The defenses are up to the defendants.
 2  When they present them, we will respond to them.  But,
 3  they are not in a position to get summary judgment at
 4  this juncture.
 5         THE COURT:  Okay.  As it relates to the Rule
 6  50 motion, the Court will deny the motion.  The
 7  testimony is sufficient at this point for us to
 8  continue this matter.
 9         As to the defenses, the Court will deny the
10  motion as well.
11         We will take a brief recess and we will
12  proceed.
13         (Recess)
14
15
16
17
18
19
20
21
22
23
24
25
```

ProTEXT Transcript Condensing for Windows

```
 SHEET 6   PAGE 21
0195
1                      INDEX
2
3
4  PLAINTIFF'S WITNESS      D      C      RD      RC
5
6     Kevin Dowd           3     10
7
8
9  DEFENDANTS' WITNESSES
10
11    Dominique Blieck    57    115    177     185
12                                     192
13
14
15                   CERTIFICATE
16        We certify that the foregoing transcript is a
17  true and accurate record of the proceedings in the
18  above-captioned matter
19  _____      _____
20  Date
21  _____      _____
22  Date
23  _____      _____
24  Date
25
```

Checkpoint Systems, Inc. v. All-tag Security S.A., et al.                    Day 5, 2/02/07

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHECKPOINT SYSTEMS, INC.,
        Plaintiff

        vs.                                 Civil Action
                                            01-2223
ALL-TAG SECURITY S.A.,
ALL-TAG SECURITY AMERICAS, INC.,
and SENSORMATIC ELECTRONICS CORP.,
        Defendants

                                            Day 5 of Trial
                                            February 2, 2007
                                            Courtroom 9-B
                                            Philadelphia, PA

_____

        Before THE HONORABLE PETRESE B. TUCKER, J.
                    and a Jury

_____

APPEARANCES:

Dennis R. Suplee, Esq.                      For the Plaintiff
Thomas W. Hazlett, Esq.
Robert A. McKinley, Esq.
SCHNADER HARRISON SEGAL
     & LEWIS LLP
1600 Market Street
Suite 3600
Philadelphia, PA  19103-7286

                    Nancy O'Neill
                    Suzanne White
                    Sidney Rothschild
                  Official Court Reporters
                   1234 U.S. Courthouse
                    601 Market Street
                  Philadelphia, PA  19106

Checkpoint Systems, Inc. v. All-tag Security S.A., et al.                                    Day 5, 2/02/07

<table>
<tr><td>

Page 4

1    It is.  But that's the purpose for which we are going to
2    be using it.
3         MR. SUPLEE:  Your Honor, what it shows is
4    machines making tags.  We know they have machines.  We
5    know the machines make tags.  That's all it shows.  It
6    doesn't show anything about the characteristics of the
7    tags, which is what the case is all about.
8         MS. QUINN:  Your Honor, that will come
9    separately through a separate witness.  But there is a
10   product claim and a process claim in this case.  And so
11   we would like the jury to know what the process is that
12   we used to make the tags.
13        MR. TILLERY:  Your Honor, if I may, I don't
14   have a dog in this fight, but I might point out two
15   things.  Number 1, defendant has already used a portion
16   of this, and all we are trying to do is to put in the
17   complete video.
18        And secondly, to the extent that Mr. Suplee is
19   concerned about the jury knowing that All-Tag is a small
20   company, Mr. Suplee himself elicited that testimony from
21   the All-Tag witness, so he already but that evidence on
22   the record.  It's no surprise.  It's nothing new.
23        MR. SUPLEE:  In the first place, Mr. Tillery
24   is mistaken.  We did not use any part of that videotape.
25   What we used was a different videotape prepared by

</td></tr>
</table>

**APPEARANCES:** (cont'd)

Theodore A. Breiner, Esq.          For All-Tag
Jennifer A. Harchick, Esq.
BREINER & BREINER, LLC
115 North Henry Street
Alexandria, VA  22314

Tracy Zurzolo Quinn, Esq.
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

M. Kelly Tillery, Esq.          For Sensormatic
Erik N. Videlock, Esq.
PEPPER HAMILTON, LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA  19103-2799

---

Page 3

1                    PROCEEDINGS
2         THE COURT:  Good morning.  You may be seated.
3         Mr. Suplee, I understand that you want to put
4    something on the record before the jurors are brought
5    out.
6         MR. SUPLEE:  Yes, your Honor.  I understand
7    that defendants -- that Ms. Quinn in her direct
8    examination of Mr. Boels is going to use defendant's
9    exhibit 433 which is a videotape of the All-Tag plant.
10   I didn't time it, your Honor, but I would guess it runs
11   10 to 15 minutes.  And all it is is a tour of the
12   defendant's facility.  It doesn't show one way or the
13   other whether there is a throughhole in the tag, and
14   it's not relevant to any issue in the case other than to
15   try to say to the jury we are a very little company and,
16   therefore, you shouldn't return a verdict against us.
17        THE COURT:  Okay.
18        Ms. Quinn.
19        MS. QUINN:  Actually, your Honor, it is
20   relevant because that is the means by which Mr. Boels is
21   going to explain the process through which All-Tag has
22   made it's product since April of 2001.  So it's not just
23   a nice little factory tour.  It's showing the machines
24   that are used to make its tags.
25        I can't help that All-Tag is a small company.

---

Page 5

1    All-Tag as to how its product is manufactured.
2         And in the second place, there is no way in
3    looking at this videotape that you can tell whether
4    claim 1 or claim 15 is infringed.  It just walks up and
5    down the corridors, shows the machines, shows a tree out
6    in front of the building.
7         And it's obvious that it has been mentioned
8    here that Checkpoint is big and All-Tag is small.  But
9    we really don't need a 15-minute interlude to try to
10   reinforce that point for the jury.  It is going to be
11   hard enough to put that aside as it is.
12        THE COURT:  I'm going to permit the video.
13   It's going to be used in conjunction with testimony?
14        MS. QUINN:  Yes, your Honor.  Mr. Boels is
15   going to explain the process by which they make their
16   tags.
17        THE COURT:  I'm going to permit it, and your
18   objection is noted.
19        MR. SUPLEE:  Understood, your Honor.
20        I have alerted defense counsel when the jury
21   is first brought in, I would like to move into evidence
22   certain exhibits that I used during the
23   cross-examination of Mr. Blieck.
24        THE COURT:  Okay.
25        MR. TILLERY:  Your Honor, I apologize to the

Checkpoint Systems, Inc. v. All-tag Security S.A., et al.                                          Day 5, 2/02/07

Page 22

1   everything and we already sued, but --
2   Q   Do you remember what they sued you for?
3   A   Yes.  This was regarding our patent via ITT
4   commission.
5   Q   And did All-Tag win that lawsuit?
6   A   Yes.
7   Q   What was the effect of that lawsuit on All-Tag
8   Switzerland?
9   A   But let's say I was happy and we were happy that we
10  won.
11       MR. SUPLEE:  Objection.
12       THE COURT:  Overruled.
13       You may proceed.
14       THE WITNESS:  We were happy to won.  But the
15  problem is we were running out of money because that
16  cost us a lot of money.  And secondly, they have make a
17  lot of advertising about this court case.  It was good
18  for me, but they have sent a letter to all the major
19  customer in Europe and in U.S., explain that All-Tag
20  existing, Mr. Boels existing.  And they say to all their
21  customer, be careful, a new company called All-Tag
22  managed by Mr. Boels will come on the market and it is
23  not a good tag, blah, blah, blah.
24       It was good for me because in -- on their cost
25  they have make a very nice advertisement for our company

Page 23

1   because everybody -- all the major customer know us at
2   that time.  It was free advertising.  Thank you very
3   much.  But in the other side, we were running out of
4   money because we have spent too much money in the court
5   case.
6   Q   What happened to All-Tag Switzerland after the
7   court case?
8   A   We were need money and -- because we were on the
9   out.  And we have a good friend in Belgium was
10  interested to come in the company since we start because
11  he was thinking it's a good business.  And at that time
12  I called him and say, if you want you can join us
13  because we need to increase -- put more money in the
14  company.  And that's -- it was a strategy.
15  Q   What was this person's name?
16  A   It was Mr. Dominique Blieck that I know since many
17  years.
18  Q   And so Mr. Dominique Blieck joined you?
19  A   Yes, I invite him to come in Zurich.  We have a
20  meeting there.  And he decide to join us by putting more
21  money to pay different things we have to pay urgently.
22  Q   And did you make any decisions to change the
23  company?
24  A   Yes.  At that time Mr. Blieck said to me I agree to
25  put some more money in this organization, but I would

Page 24

1   like to have more control with you.  And he said that I
2   would like that we move -- we decide together that we
3   will move everything to Belgium.  That mean we create a
4   new company in Belgium.  We will buy the machine and
5   accessory of All-Tag Switzerland, and Belgium will be
6   run by me as the CEO.
7   Q   Who was the CEO of All-Tag Switzerland?
8   A   Mr. Pichl.
9   Q   And so now All-Tag Belgium, you're going to be the
10  CEO?
11  A   Yes, in '95.  End of '95 create a new company and I
12  start as the CEO there.
13  Q   How did Mr. Pichl react to you becoming the CEO?
14  A   It was a big battle because it was -- he start the
15  company with me, but let's say he was the CEO and he was
16  older than me.  He was not so happy about the decision,
17  but it was -- he have to accept that.
18  Q   Did he continue to work with the new All-Tag
19  Belgium?
20  A   He was not working on a day-to-day basis because he
21  was still living in Switzerland, and he was coming one
22  week per month to help us or to, let's say, to try to
23  make it better.
24  Q   Where did you set up your factory in Belgium?
25  A   We decide to put that 30 minutes from Brussels.

Page 25

1   It's an area where the land and everything is very
2   cheap.  It was the right place to put.  You are in the
3   middle of Europe, middle of the motorway, middle of the
4   highway.  And let's see --
5   Q   Did you buy an existing factory?
6   A   No.  We buy the land and we loan -- and we start a
7   new building, new factory.
8   Q   And you say you bought the equipment from All-Tag
9   Switzerland?
10  A   Yes.
11  Q   Did Mr. Jorgensen do any work for All-Tag Belgium?
12  A   Mr. Jorgensen follow me at that time.  That means
13  we decide that we will make a new contract with him, a
14  new consultant contract.
15  Q   So you sign a new consultant contract with Mr.
16  Jorgensen?
17  A   Yes.
18  Q   Does he still have his own business?
19  A   He still continue his own business in Denmark, yes,
20  sure.
21  Q   Does he still have other customers?
22  A   He still have other customers, yeah.
23  Q   When did All-Tag Belgium first start selling tags?
24  A   Because we bought the machine, we moved the
25  machine, and the machine have been all in one week.

Checkpoint Systems, Inc. v. All-tag Security S.A., et al.                                    Day 5, 2/02/07

Page 26

1  That mean it was perceived to start immediately to
2  produce, and we have start -- we continued to sell while
3  -- or we start to sell at that time.
4  Q    When did it first selling tags into the U.S.?
5  A    '95.
6  Q    Are you generally familiar with how All-Tag Belgium
7  makes its tags?
8  A    I know mechanically what happen -- I'm sorry,
9  mechanically how they make their tags, yes.
10  Q    Have you made the tags the same way since 1995?
11  A    Yes.
12  Q    Has there been any changes in the way you make your
13  tags?
14  A    We have -- at that time we have improved a little
15  bit different thing regarding the machine and
16  everything.  But we have continued on the same, yeah.
17  Q    Did you still make your tags today the same way you
18  made them in 1995?
19  A    No.  We have changed many thing, and different
20  machine, and we use today another patent.
21  Q    Can you explain to me what you mean?
22  A    To the machine?
23  Q    Well, I didn't understand.  Have there been changes
24  from 1995 to today?
25  A    Yeah, we change in 2001.

Page 27

1  Q    And are you generally familiar with the way All-Tag
2  Belgium makes its tags today?
3  A    Yes, I know how to run the machine.
4  Q    So you know the machines generally?
5  A    Yeah.
6  Q    Do you have a video that shows the machines that
7  All-Tag uses to make its tags today?
8  A    Yes, I can show you.
9  Q    Who made that video?
10  A    I make myself.
11  Q    You made the video yourself?
12  A    Yeah.
13  Q    And the process that is shown in the video, how
14  long has All-Tag Belgium been using that process?
15  A    The new process we started in 2001.
16  Q    So is that the same process you used before 2001?
17  A    No, it's a new process.
18  Q    Is it different?
19  A    It's a different process.
20  Q    Different from what you used before 2001?
21  A    Yes.
22        MS. QUINN:  Your Honor, at this time we would
23  like to show defendant's exhibit 433, which is the video
24  that Mr. Boels just described.
25        THE COURT:  Yes.

Page 28

1        MS. QUINN:  Thank you.
2  BY MS. QUINN:
3  Q    Mr. Boels, the gentleman back here is going to show
4  the video.  And what I would like you to do, please, is
5  explain to us what we're seeing.  And if you need at
6  some point to stop so you can explain something, you
7  tell us, or maybe I will stop to ask a question.  But
8  this gentlemen back here will be running the machine.
9  A    Okay.
10  Q    Okay?
11        (Videotape was commenced)
12        What are we looking at here?
13  A    This is the factory located outside Brussels.  At
14  the beginning it was smaller than that.  We have start
15  only with 12 thousand square feet.  On the right side is
16  the administration department.  And the factory today is
17  three times that.  It's around 40,000.
18  Q    It's about three times of when you started?
19  A    Yes.
20        That would be the entrance.  The
21  administration right and left.
22        Sorry.  It's the first time I make a report
23  like that.
24  Q    Now we are getting ready to go inside.
25  A    Okay.  We cross on the right side is my office and

Page 29

1  two secretary.  On the left side is CFO and one
2  secretary.
3        This is all different machines.  All the
4  machines are -- Sorry.  All the machine are made by
5  ourselves.
6  Q    All-Tag makes it's own machines?
7  A    Yes.  And now we go -- we will explain it's an
8  overall view of one part of the factory.
9        On the left side it's all the machine making
10  the deactivation process.  And make the tag in life.
11  Q    Make at alive.
12  A    And we -- at the beginning we have only one
13  machine, now two machines, now we have eight.
14        Stop please.  This is the basic material that
15  we use.  That means it's sandwich of aluminum,
16  polypropylene and aluminum printed both sides by the
17  circuit.
18  Q    Let me ask.  So this is basically the sandwiche of
19  aluminum, polypropylene and aluminum?
20  A    Yes.
21  Q    Do you make this yourself?
22  A    No.
23  Q    You buy this from somewhere?
24  A    Yes.
25  Q    And is this what you sometimes refer to as web?

Checkpoint Systems, Inc. v. All-tag Security S.A., et al.                                      Day 5, 2/02/07

Page 140

1   Q   You remember Mr. Suplee asking you some questions
2   about letters from Sensormatic?
3   A   Yeah.
4   Q   Look again at plaintiff's exhibit 107, please.  Do
5   you remember him asking you about this letter?
6   A   Yeah.
7   Q   And if we could focus in on the second paragraph
8   there.  Take your time and read as long as you need.
9           But do I understand correctly that in this
10  letter Sensormatic was asking for more information about
11  how All-Tag makes its products?
12  A   Yes.
13  Q   The letter talks about G4 and G5?
14  A   Yes.
15  Q   What is G4 and G5?
16  A   Because we try different -- we improve our machine,
17  we have at one moment to design to make a reference
18  because we improve our process, and it was a
19  redistribution to give a name to something.
20  Q   So, at various points during the company, you're
21  making improvements to the process?
22  A   Yeah.
23  Q   Who was making those improvements?
24  A   Mr. Jorgensen and -- R & D in the factory.
25  Q   And was Mr. Jorgensen working on making these

Page 141

1   improvements to the process from the beginning of
2   All-Tag Belgium?
3   A   Yes.
4   Q   So from the very beginning?
5   A   Yeah.
6   Q   And over time you gave the improvements different
7   names?
8   A   Yes.
9   Q   G1, G2, G3?
10  A   Exactly.
11  Q   And so on.
12          And so with Sensormatic, you said Sensormatic
13  was both your customer and a competitor?
14  A   Yes.
15  Q   And you were comfortable telling Sensormatic that
16  generally your process was covered by a patent?
17  A   Sure, they know that, and they have checked that.
18  Q   But what you didn't want to tell them was about the
19  other improvements that you were making, is that right?
20  A   Yes.
21  Q   Okay.  And why not?
22  A   Because we didn't change the process completely.
23  We were -- would stay in the size of the patent.  But we
24  find different tools or different things to increase the
25  speed of the machine or some different points like

Page 142

1   that.  And that's the reason why we give different name
2   on that.  And I didn't -- as I say, I didn't want to
3   give secret regarding production or how to produce
4   because we were afraid that maybe one day a competitor
5   have a new idea different than buying the label from us.
6   Q   So, the processes we have been talking about, there
7   is a process before April 2001 covered by one patent?
8   A   Yes.
9   Q   And a process after April 2001 covered by another
10  patent?
11  A   Yes.
12  Q   But always improvements going on in between?
13  A   Yes.  As any company improve what they are doing.
14  Q   So if somebody wanted to really understand what
15  All-Tag -- how All-Tag makes its product, is it enough
16  for them to know the patent?
17          MR. SUPLEE:  Objection.
18          THE COURT:  Overruled.
19          THE WITNESS:  Sorry.  Repeat.
20  BY MS. QUINN:
21  Q   So if somebody wanted to understand how All-Tag
22  makes its product, is it enough to just read the patent?
23  Does the patent tell you everything about how you
24  actually make your product?
25  A   I believe.  I think so.

Page 143

1   Q   Then why didn't you want to tell Sensormatic about
2   the improvements?
3   A   Because I think when you produce something you have
4   some clever idea to do what the patent say.
5   Q   So there is the patent and there is also the
6   improvements?
7   A   I think so, yeah.
8   Q   And those things together are how you make the
9   product?
10  A   Exactly.
11          MR. QUINN:  Your Honor, at this time I think I
12  neglected to move into evidence defendant's exhibits 434
13  and 312.  We would like to offer them at this time.
14          THE COURT:  434 and 312.
15          MS. QUINN:  I have nothing further.  Thank
16  you.
17          MR. TILLERY:  Your Honor, I have some
18  questions.
19          THE COURT:  Okay.
20          MR. TILLERY:  Can we have the exhibit 148.
21  BY MR. TILLERY:
22  Q   Mr. Boels, this letter to you from Neil Austin,
23  Vice President and General Counsel and secretary of
24  Checkpoint is dated July 2, 1998.  This Neil Austin, he
25  is the same guy who threatened you with a lawsuit in

Checkpoint Systems, Inc. v. All-tag Security S.A., et al.                                      Day 5, 2/02/07

Page 189

```
 1            If there is anything that you need me to
 2   review, if you can get her a little early.
 3            MR. TILLERY:  We will do that.
 4            THE COURT:  Have a good weekend.
 5            (Trial adjourned at 3:35 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 190

```
 1            I N D E X
 2         DIRECT   CROSS REDIRECT RECROSS
 3   OLIVIER BOELS     8     81    137    148
 4   STUART SEIDEL    151    170   185
 5
 6
 7
 8       C E R T I F I C A T E
 9
10
         NANCY O'NEIL, SUZANNE WHITE, SIDNEY
11   ROTHSCHILD, being United States Court Reporters,
     United States District Court, Eastern District of
12   Pennsylvania, do hereby certify that we are authorized
     to and did report in shorthand, the above and
13   foregoing proceedings, and that thereafter our
     shorthand notes were transcribed under our
14   supervision, and that the foregoing pages contain a
     true and correct transcription of our shorthand notes
15   taken therein.
         Done and signed this 2nd day of February,
16   2007, in the City of Philadelphia, County of
     Philadelphia, State of Pennsylvania.
17
     NANCY O'NEIL
18
     SUZANNE WHITE
19
     SIDNEY S. ROTHSCHILD
20
21
22       U.S. Court Reporters
         United States District Court
23   Eastern District of Pennsylvania
24
25
```

2 (Pages 189 to 190)

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                    Day 10, 2/09/07

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CHECKPOINT SYSTEMS, INC.,
          Plaintiff


          vs.                          Civil Action
                                       01-2223
ALL-TAG SECURITY S.A.,
ALL-TAG SECURITY AMERICAS, INC.,
and SENSORMATIC ELECTRONICS CORP.,
          Defendants


                                       Day 10 of Trial
                                       February 9, 2007
                                       Courtroom 9-B
                                       Philadelphia, PA

          _____

          Before THE HONORABLE PETRESE B. TUCKER, J.
                      and a Jury

          _____


APPEARANCES:

Dennis R. Suplee, Esq.              For the Plaintiff
Thomas W. Hazlett, Esq.
Robert A. McKinley, Esq.
SCHNADER HARRISON SEGAL
    & LEWIS LLP
1600 Market Street
Suite 3600
Philadelphia, PA  19103-7286


                Nancy O'Neill
                Suzanne White
               Sidney Rothschild
            Official Court Reporters
             1234 U.S. Courthouse
              601 Market Street
             Philadelphia, PA  19106

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                    Day 10, 2/09/07

APPEARANCES: (cont'd)

Theodore A. Breiner, Esq.          For All-Tag
Jennifer A. Harchick, Esq.
BREINER & BREINER, LLC
115 North Henry Street
Alexandria, VA  22314


Tracy Zurzolo Quinn, Esq.
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103


M. Kelly Tillery, Esq.          For Sensormatic
Erik N. Videlock, Esq.
Charles Marion, Esq.
PEPPER HAMILTON, LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA  19103-2799

Page 4

1     I hope we can reach a stipulation, but I don't
2  know if we can.  I would like to raise the issue because
3  it's a factual matter that we would like introduced.
4  But I don't think it's appropriate to put All-Tag's
5  trial counsel on the stand.
6          MR. SUPLEE:  Your Honor, the letter in
7  question was sent to James Cashl who is a lawyer at
8  Montgomery McCracken who represented Checkpoint before
9  we were in the case.
10         MS. QUINN:  It was sent to Mr. Armstrong
11 actually.
12         MR. SUPLEE:  Pardon?
13         MS. QUINN:  It was sent to Mr. Armstrong.
14         THE COURT:  Well, it was different counsel.
15         MR. SUPLEE:  It was different counsel.
16         And counsel in that case for Montgomery, if
17 they are going do this, then we want to get counsel from
18 Montgomery to come in here and say those tags were not
19 produced.  So we object to the affidavit going in.  I
20 haven't seen the affidavit before.  And they think to
21 spring this at the last minute is just not fair.
22         They did give us the letter yesterday, but the
23 letter itself is not admissible obviously.
24         MS. QUINN:  We would be happy to show the
25 affidavit.  It just says what I just said, that

Page 3

1              PROCEEDINGS
2          THE COURT:  Good morning.  You may be seated
3  Mr. Breiner.
4          MR. BREINER:  We have a couple of preliminary
5  matte rs which Ms. Quinn will address.
6          MS. QUINN:  Yes.  I will take the shorter one
7  first.  I think we neglected yesterday to move into
8  evidence exhibit D-511, the demonstrative.
9          THE COURT:  Okay.
10         MS. QUINN:  We will do that now.
11         Next, your Honor, as an evidentiary matter,
12 Dr. Rose testified yesterday about certain All-Tag tags
13 that he reviewed.  He had the envelopes, he identified
14 the tags by Bates number and identified them as
15 product 2, things made after 2001 in Belgium.
16         What we would like to get into evidence is the
17 fact that samples of those same tags were produced to
18 Checkpoint in 2002.  The person with actual knowledge of
19 that happens to be Mr. Breiner.  We don't think it's
20 appropriate to put Mr. Breiner on the stand subject to
21 cross-examination in the middle of a jury trial.
22         We have prepared an affidavit from him
23 attesting to the fact that counterparts of those tags
24 with those Bates number were produced to Checkpoint in
25 2002.

Page 5

1  counterparts of those tags were produced.
2          THE COURT:  Well --
3          MS. QUINN:  If they want to call Mr. Armstrong
4  in here to testify, that's okay.
5          MR. SUPLEE:  Well, I don't really see how they
6  get this in by affidavit.  They need somebody to testify
7  about it.
8          MS. QUINN:  Well, your Honor, that is why I
9  wanted to raise this now.  The person with personal
10 knowledge is Mr. Breiner, which is really not seemly to
11 put trial counsel on the stand subject to
12 cross-examination.
13         MR. SUPLEE:  Especially since he hasn't been
14 listed as a witness.
15         So, your Honor, I don't think this comes in.
16 This is not right to hit us with this at the last minute
17 and you have to got a "witness" who -- a witness in
18 quotations marks -- who was not on the pretrial
19 memorandum, not previously disclosed.
20         THE COURT:  Let me suggest that you review the
21 affidavit and perhaps have some discussions as to
22 whether or not there can be a stipulation as to what the
23 attorney from Montgomery McCracken would testify to.
24 And that way you can get both of them if it comes in at
25 all.

2 (Pages 2 to 5)

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.

Day 10, 2/09/07

**Page 6**

1    MR. SUPLEE: If it is going to go in, we are
2  going to call the attorney from Montgomery McCracken and
3  put him on the witness stand.
4    MR. TILLERY: We would look forward to cross
5  examining Mr. Armstrong.
6    MS. QUINN: That would be fine, your
7  Honor.
8    And it is unfortunate, trial is somewhat of a
9  fluid thing. And as your Honor knows, it wasn't until
10  just on the eve of trial that we were able to discover
11  exactly what Dr. Zahn had examined. A lot of things are
12  happening as facts are learned.
13    But now that we have determined what Dr. Zahn
14  reviewed and what Dr. Rose reviewed and now that that is
15  a live issue for this jury to consider, we think it's
16  appropriate for the jury to know that Checkpoint had
17  actual samples of these product 2 tags as early as 2000.
18    MR. SUPLEE: Well, we didn't have the samples
19  as Mr. Cashl will testify. And counsel has known about
20  these tags for months. They were produced at Dr. Zahn's
21  deposition, so there is nothing fluid or new or anything
22  like that.
23    If there is anything fluid or new, it's the
24  defendant's position that there are two different
25  products and that the '343 is different from the '466.

**Page 7**

1    MS. QUINN: That's a misstatement of
2  discovery, your Honor.
3    THE COURT: Well, if you will pass up a copy
4  of the affidavit to me and provide a copy to counsel.
5    MR. TILLERY: Your Honor, we were astounded
6  that Dr. Zahn had not looked at the product. And we
7  thought with Checkpoint checking the marketplace on a
8  regular basis as they do, that they were perfectly aware
9  of what product was out and had tested it and provided
10  their expert with the correct tags. It's shocking that
11  they did not.
12    MR. McKINLEY: Your Honor, we had a request
13  for documents and things that specifically asked for
14  them to identify the different products. I believe it
15  was requested #54. And they referred us to documents
16  under 33-d. Well, Dr. Rose testified yesterday that
17  there are no documents that describe the product or the
18  process that the tags are made by. So that request was
19  completely improper and misleading to us.
20    At no time did counsel until June 16th of 2000
21  did we learn that there were two distinct processes that
22  were made and there was a line of demarcation in 2001
23  between a process after that point and a process before.
24  Everything else has been very mysterious to say the
25  least.

**Page 8**

1    MR. TILLERY: Your Honor, I have here an
2  actual copy of the letter that was sent to Mr.
3  Armstrong, at Morgan & Finnagan who was my predecessor
4  on behalf of Sensormatic, with enclosures by Federal
5  Express. I have the Federal Express copy and I have the
6  actual photocopies of the tags -- I'm sorry, the actual
7  tags. So if Mr. Hugh (phon.) got a copy of the actual
8  tags, certainly Mr. Armstrong got a copy of the actual
9  tags. And if he didn't, because the letter says,
10  enclosed are the items, the materials. It doesn't say
11  photocopies. He got them because Christopher Hugh got
12  them.
13    MS. QUINN: And, your Honor, I'm holding in my
14  hand our response -- All-Tag's responses to Checkpoint's
15  request number 54 in which three samples of resonant
16  tags were requested, and we said samples would be
17  produced. And that's back again in -- I have a date
18  here -- back in '02, February 1 of '02.
19    MR. TILLERY: And if Mr. Armstrong didn't get
20  what was referenced in the letter, one would have
21  thought he would have raised holy hell and scream and
22  write a letter and say where are they? That never
23  happened.
24    THE COURT: Okay. I will let you know
25  shortly.

**Page 9**

1    MS. QUINN: Thank you, your Honor.
2    THE COURT: Is there anything else?
3    MS. QUINN: At this time, your Honor, the only
4  thing I would like to put on the court's radar screen,
5  once we rest our case and get into the plaintiff's
6  rebuttal case, our concern is that the plaintiffs not
7  trying to reargue their infringement case through Dr.
8  Zahn. I raise that now because Mr. McKinley, at the end
9  of his examination of Dr. Rose, suggested that he was
10  now going to go back to Dr. Zahn and ask about what
11  happened in the dielectric layer, whether plastic melts
12  or evaporates. That's their infringement case in chief.
13  If they had something to say about that, they should
14  have said it at the start. And so we have a motion
15  outstanding on that.
16    I don't know whether it's an issue or not. I
17  know Mr. Suplee would like to take it one step at a
18  time, and that's appropriate. But Mr. McKinley's
19  comments raised a real concern as to whether there is
20  going to be an issue that is going to interrupt the flow
21  of these proceedings.
22    MR. SUPLEE: There were a lot of things
23  mentioned during the course of the defendant's case that
24  we want to respond to, whether they bear on infringement
25  or they bear on something else, including the question

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                    Day 10, 2/09/07

Page 75

1   EXHIBITS TOGETHER DURING THE BREAK AND WE WILL DO IT
2   THEN.
3         THE COURT:  THAT'S FINE.
4         MR. BREINER:  WITH THE EXCEPTION OF THE
5   ISSUE WE RAISED THIS MORNING, YOUR HONOR, THAT CONCLUDES
6   THE ALL-TAG CASE.
7         THE COURT:  OKAY.  WE ARE GOING TO TAKE A
8   BRIEF RECESS.
9         THE CLERK:  ALL RISE.
10        (JURY OUT.)
11        THE COURT:  OKAY.  YOU MAY BE SEATED.  ON
12  THE ISSUE THAT WAS RAISED THIS MORNING, THE COURT IS
13  GOING TO PERMIT THE EVIDENCE TO COME IN BY WAY OF
14  AFFIDAVIT AND UNDERSTANDING THAT MR. ARMSTRONG WILL BE
15  CALLED AS A WITNESS.
16        MR. SUPLEE:  IT WILL BE MR. CASHEL WHO
17  WAS WORKING WITH MR. ARMSTRONG.
18        THE COURT:  WE WILL TAKE A BRIEF RECESS.
19        MS. QUINN:  THANK YOU.
20        (BREAK TAKEN.)
21
22
23
24
25

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                    Day 10, 2/09/07

Page 76

1                    THE COURT:   You may be seated.

2                    MR. SUPLEE:   Your Honor, there are a couple

3      of things before the jury is brought in.

4                    First of all in connection with the charge

5      that was handed up to your Honor on inventorship this

6      morning, we had previously requested a charge that

7      documentary corroboration was required.   The Court

8      overruled that.

9                    We have worked out what we have worked out

10     with opposing counsel.   I didn't want the substitution

11     of this one to be taken as abandoning our request on

12     our previous request.

13                   The second thing is on Mr. Cashel, we want to

14     get an affidavit from Mr. Cashel and put his affidavit

15     in the record.

16                   He was previously counsel for Checkpoint in

17     this case and in fact has continued to work on the

18     case during our tenure.

19                   MR. TILLERY:   This is different than what he

20     said about 20 minutes ago, he was bringing him in to

21     testify.

22                   I would like an opportunity to cross-examine

23     Mr. Cashel.   Did he receive the letter?   Did he read

24     it?   Did he understand it?   If he didn't get the tags

25     why didn't he call Mr. Breiner and ask for them?   What

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                                Day 10, 2/09/07

Page 77

1   else did he not do?  Why did he not ask his client,
2   Mr. Mazoki, to go to the marketplace to get them?
3        I'm entitled to ask all of those questions,
4   if plaintiffs are going to argue to the jury that
5   their expert didn't examine the right tags because we
6   didn't give them to him; that sounds like what thy
7   will do.
8        THE COURT:  At this point it is going to be
9   affidavit for affidavit.  I'm going to permit that.
10  You can argue however you want to argue.
11       MR. TILLERY:  So, your Honor, the plaintiffs
12  will be able to argue that their expert examined the
13  tags of another company, not the accused products of
14  the defendants and the reason that they examined the
15  wrong tags, they will have a man testify to the wrong
16  tags because we didn't produce them to them?
17       We got to explore that topic.
18       THE COURT:  I don't know what the affidavit
19  is going to say.
20       MR. TILLERY:  I don't know either.
21       THE COURT:  I would assume that the attorney
22  is going to state he didn't receive the tags.
23       MR. TILLERY:  What is he going to say?
24       THE COURT:  You two can speak to one another
25  about it.

Page 78

1        MR. SUPLEE:  Your Honor, the affidavit is not
2   here.  We will have it after lunch.  I'll show it to
3   counsel.  I didn't see Mr. Breiner's affidavit until
4   it was handed to the Court this morning.
5        We will have it after lunch.  We will submit
6   it and fair is fair.
7        MR. TILLERY:  We will issue a trial subpoena
8   for Mr. Cashel and Mr. Armstrong and bring them in our
9   rebuttal case.
10       THE COURT:  You may do whatever you think is
11  appropriate.  He will object and I will rule.
12       MR. SUPLEE:  That's the way that it works.
13       THE COURT:  Yes.
14       MR. BREINER:  Nothing is more difficult.
15       I have exhibit numbers for Mr. Mazoki.  I
16  would like to put into evidence.
17       They are defendant's exhibits 215, 216, 217,
18  221, 223, 225, 330, 332, 352 and 415.
19       THE COURT:  Okay.
20       MR. BREINER:  The second issue on the jury
21  instruction, on the issue of obviousness, the parties
22  have reached an agreement.
23       What we propose that your Honor's instruction
24  at page 33, between the third and fourth paragraph, we
25  have language which we agreed to, can be put in

Page 79

1   talking about the motivation suggestion.
2        If I can pass that up.  It is what is
3   highlighted in the yellow.
4        Thank you, your Honor.
5        THE COURT:  Now, is there any other evidence
6   to be presented by All-Tag?
7        MR. BREINER:  No, your Honor.
8        MS. QUINN:  At this point it is just a
9   question of the affidavit.  I suggest we reserve on
10  that until we get it all sorted out about lawyers
11  being subpoenaed.
12       THE COURT:  Okay.
13       MR. TILLERY:  Your Honor, we are prepared to
14  proceed.  The only witness we will have in addition to
15  Mr. Engdahl that already testified out of order,
16  remember Mr. Engdahl, your Honor?
17       THE COURT:  Yes.
18       MR. TILLERY:  Mr. Patterson, Hubert Patterson
19  will testify by way of videotape and we will move
20  documents in evidence.
21       THE COURT:  How long is the videotape?
22       MR. TILLERY:  I believe it is a little less
23  than an hour.
24       MR. HAZLETT:  There is some testimony in Mr.
25  Patterson's videotape, the position related to

Page 80

1   Checkpoint bringing suit against certain competitors.
2   The Court had ruled previously that sort of
3   testimony was admissible, but, so therefore we allow
4   - - agreed it could be played as part of the
5   videotape, but we do stand by that objection.
6        THE COURT:  Very well.
7        MR. BREINER:  One other issue.  Mr. Suplee
8   made his objection on the inventorship instruction.
9   For the record, our position has been that the
10  testimony of Mr. Jorgensen will be sufficient for
11  corroboration.
12       We understand that your Honor wants more than
13  that.  We want to make our objection noted also.
14       MR. TILLERY:  We join in that, your Honor.
15       MR. SUPLEE:  I don't know if now is the time.
16  I assume to the extent that the Court overruled our
17  other request for instructions, that we have an
18  exception or whatever for the record.
19       THE COURT:  Absolutely.  You will get an
20  opportunity at the conclusion of the instructions to
21  object and make any corrections or additions.
22       MR. SUPLEE:  Thank you, your Honor.
23       (Jury in the box)
24       THE COURT:  You may be seated.
25       MR. TILLERY:  Your Honor, we would like to

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                    Day 10, 2/09/07

Page 81

1  call by way of videotape deposition, Hubert Patterson.
2         Your Honor, we are beginning Sensormatic's
3  case.  We remind the jury that my first witness was
4  Walter Engdahl.  He already testified out of order.
5         THE COURT:  You have done that.
6         We are moving into the Sensormatic case and
7  this is the second witness.
8         MR. TILLERY:  Thank you, your Honor.
9         Proceed, please.
10        (The videotape deposition of Hubert
11  Patterson, played.)
12        (End of the videotape deposition)
13        MR. TILLERY:  Your Honor, I have some
14  documents to move into evidence.  Perhaps this is a
15  good time to do that.
16        THE COURT:  Yes.
17        MR. TILLERY:  On behalf of Sensormatic, we
18  would like to put in defendant's exhibits 230, 303,
19  defendant's Exhibit 381, defendant's Exhibit 415,
20  defendant's Exhibit 512 and defendant's Exhibit 513.
21  The last being two demonstrative -- being put in as
22  demonstrative not substantive evidence.
23        With that we are prepared to rest except for
24  the witnesses.  We have trial subpoenas served as we
25  speak.  We talked about previously depending on what

Page 82

1  happens with rebuttal, we want to bring those
2  witnesses back.
3         THE COURT:  Okay.
4         MR. TILLERY:  Otherwise Sensormatic rests,
5  your Honor.
6         THE COURT:  To give counsel an opportunity to
7  discuss what we talked about earlier before All-Tag
8  rested, we will break now.
9         (Jury leaves the courtroom.)
10        MR. SUPLEE:  Your Honor, if I may, we have
11  the affidavit of James D. Cashel, which I have handed
12  to other counsel.  And if I could hand a copy to Mrs.
13  Asare.
14        I had forgotten if I ever knew that Mr.
15  McKinley had already secured an affidavit from Mr.
16  Cashel following opening speeches.  And, that's why
17  the affidavit is dated January 29th to try to reduce,
18  even better, yet eliminate dispute, I would agree to
19  strike paragraph three from the affidavit.
20        MR. TILLERY:  Your Honor, we object to this
21  affidavit.  I would like to be able to cross-examine
22  this gentleman.  This affidavit does not refer to the
23  letter in question of Mr. Breiner to Stephen
24  Armstrong.  It is not from Stephen Armstrong but
25  someone else, Mr. Cashel, November 21, 2002 which

Page 83

1  refers specifically to the items.  He doesn't say he
2  didn't have this, didn't receive it, anything like
3  that.  I have to be able to cross-examine this
4  gentleman to determine whether or not the office
5  received this.
6         I have trial subpoenas to Mr. Cashel, Mr.
7  Armstrong, 30(b)(6) to Montgomery McCracken Walker &
8  Rhoads to determine whether or not they received it,
9  what they did, if anything or what they didn't do, if
10  anything when they did receive it.
11        I have the actual original tags here sent the
12  same time to prior counsel for Sensormatic, in New
13  York, Mr. Purview of the firm of Finnegan.  They are
14  actual tags along with a copy of the actual letter,
15  the identical materials is not to Mr. Armstrong.
16        This affidavit doesn't refer to this at all.
17  I don't think they produced product 2.  I have to be
18  able to cross-examine this gentleman to determine what
19  he did or didn't do, why.
20        MS. QUINN:  I agree with that putting in an
21  affidavit from someone at Montgomery McCracken, even
22  is a different issue than we are talking about
23  All-Tag.  It is improper to put All-Tag's counsel on
24  the stand subject to cross-examination in front of a
25  jury.  This is a witness from another law firm, he has

Page 84

1  to something to say, he should be here to be
2  cross-examined.
3         MR. TILLERY:  To resolve this, it is a sticky
4  issue with lawyers like this, we proposed that we will
5  all simply stipulate that all the All-Tag products
6  were available to all parties at all times.
7         There is testimony that Checkpoint went out
8  to the marketplace and tested All-Tag tags.  At any
9  time they could have gotten from customer are common
10  customers with All-Tag's, as they did on a regular
11  basis.
12        Counsel could have done it, if he didn't have
13  it, he could have filed a motion to compel if he
14  didn't have the right product.  None of that was done
15  pure.
16        A simple stipulation would be acceptable to
17  the defendants, to the effect at the time that the
18  products, the accused products, which are the subject
19  of this proceeding were available to the parties.
20        MS. QUINN:  If I may.
21        MR. TILLERY:  That's true.
22        MS. QUINN:  For our purposes it is true that
23  they were available, and I should note this is a live
24  issue that Mr. McKinley has said, in the presence of
25  the jury that All-Tag never identified different

Page 85

1   products before coming in this courtroom. That has
2   been planted in the jury's mind that somehow it is a
3   surprise that All-Tag has been selling different
4   products.
5        We have to be able to address that.
6        MR. TILLERY: I'm sorry.
7        MR. SUPLEE: You are doing fine.
8        MR. TILLERY: Thank you.
9        Since it is not the kind of thing you want
10  before a jury. Perhaps we can have these gentlemen
11  testify and Mr. Breiner can be subject to
12  cross-examination before your Honor. Your Honor can
13  resolve this issue. It is really sort of being
14  presented as a discovery issue never presented before.
15       But, it is not something appropriate for the
16  jury for them to be able to argue based on this, that
17  they didn't give our expert the right tags because we
18  didn't produce them is just wrong.
19       MR. SUPLEE: Thank you, your Honor.
20       I would start and end with the proposition
21  that fair is fair. If they can put in an affidavit,
22  we should be able to put in an affidavit. Mr. Cashel
23  was and is counsel for Checkpoint and has continued to
24  work with us from time to time in getting this case
25  ready for trial.

Page 86

1        In terms of saying the tags are out there in
2   the marketplace, you could have purchased them and so
3   on, they can do that. They can say to the jury they
4   were out there, they could have purchased the tags.
5        But, in terms of what's the '343 patent,
6   what's the '466 patent, it wasn't until June of this
7   year that we knew that they were saying there were two
8   different patents involved, but there was no claim,
9   there were two different products.
10       MS. QUINN: June of last year.
11       MR. SUPLEE: Of course. It wasn't until then
12  that they came up with this nomenclature of product 1,
13  product 2. The only difference between the two patents
14  is how you make the hole in the dielectric, that's all
15  it is about.
16       If they want to say they knew in June that
17  there was another patent out there, they should have
18  asked us for tags or they should have gone out to the
19  marketplace. They are free to say all of that kind of
20  thing on the record as it now stands, but there's no
21  need for a stipulation.
22       If you have Mr. Cashel come in at this point,
23  it takes a last minute move by the other side and it
24  makes it a great big issue just before the case goes
25  to the jury. That's just not fair, your Honor.

Page 87

1        Meanwhile Mr. Tillery is making noises, that
2   I should advise Montgomery McCracken that all of this
3   can lead to a malpractice suit. He would certainly in
4   fairness like them to be aware of it, would turn into
5   a charade.
6        MR. TILLERY: I think it is very serious. I
7   am serious about it.
8        THE COURT: On the issue of the affidavit,
9   I'm going to permit the affidavit of Mr. Cashel and it
10  is up to Mr. Suplee whether or not he wants to agree
11  to a stipulation and if he doesn't want to, the Court
12  is not going to force him to do that.
13       I think the state of this record as it stands
14  now, defense is free to argue the availability in the
15  marketplace. While it may not be - - I think
16  factually, it is in evidence, it is available in the
17  marketplace and you can take and run with it however
18  you want, within reason.
19       MS. QUINN: My concern there are suggestions
20  made by the counsel for Checkpoint that All-Tag had
21  hidden from Checkpoint the fact we made different
22  products over the years, it is wrong. Not only were
23  the products out in the marketplace to find them, they
24  got them in the course of this litigation, your Honor.
25       MR. BREINER: I want to correct Mr. Suplee.

Page 88

1        We provided at the same in November of 2002
2   the actual patent application that matured into the
3   '343 patent - - 2002, our first production of
4   documents. When we gave them these tags, we also gave
5   them the pant application that matured into '343
6   patent. They took depositions. They never asked once
7   about what this patent application was.
8        The first time we had any discovery request
9   that we had to identify something was in March of
10  2006, well before the June report. This is what Mr.
11  McKinley put up on the screen, our request for
12  admission, to say we produced our product generally
13  under '466 or '343. Long before that.
14       So I want this record to reflect that we
15  didn't do that, your Honor. We responded to discovery
16  fully and completely throughout this case.
17       MR. SUPLEE: We have some disagreement about
18  that, but --
19       MR. BREINER: The record will reflect that.
20       MR. SUPLEE: We disagree about that too.
21       But, your Honor, in my view it is not a great
22  big deal in the case.
23       What matters is that they said that these
24  tags are generally - - are made generally, according
25  to - - as far as we are concerned, that's what the

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                                    Day 10, 2/09/07

Page 89

1  case is all about. I'm not going to stand up to tell
2  the jury we could not have gone here, there or the
3  other place to get the tags, whatever. I would lose
4  my credibility before I got started.
5       They have got everything they need to make
6  the argument that they need without turning the very
7  end of the trial into a distracting side show.
8       MR. TILLERY: Your Honor, perhaps this solves
9  the problem. If Mr. Suplee will agree, your Honor
10  will instruct that he not be permitted to argue to
11  this jury in any way, shape or form that his case is
12  somehow flawed because the defendants did not produce
13  a product to him that he and his expert could have
14  evaluated. I think that solves our problem but it
15  sounds like he wouldn't argue but now - -
16       MR. SUPLEE: I don't like being put into a
17  box, Mr. Tillery.
18       We will tell the jury what the facts are.
19  The facts in terms of the chronology, what happened
20  here is clear.
21       That to me is a distraction and I'm not
22  getting into distractions. I want to talk about what
23  the cases is really about which is the '466 and the
24  '343, the facts, they said it more than 300 times that
25  their products are generally - - are made generally

Page 90

1  according to that.
2       You can't say that if there's an essential
3  element missing from the patent; that's what this case
4  is about.
5       MR. TILLERY: We have no problem with you
6  arguing that as strange as that argument is, we will
7  respond to it. If that is the argument, I have no
8  problem with that. I don't want this gentleman
9  standing before this jury and blame the flaws in his
10  case because the defendants did not give him the
11  accused product for his expert to examine the right
12  accused product. If he doesn't do that, I think we
13  solved the problem.
14       MS. QUINN: Mr. McKinley said that in open
15  Court in front of this jury yesterday, not until we
16  got here to Court, that All-Tag disclosed they make
17  different products; that's why it is an issue it was
18  put in the jury's mind.
19       MR. TILLERY: If he doesn't argue, it is
20  okay.
21       MS. QUINN: You can't unring a bell. There
22  you have it.
23       MR. SUPLEE: You will make your argument and
24  I'll make mine. You will make objections and Judge
25  Tucker will rule on both of them, I don't want to get

Page 91

1  into that, you can't do this or that.
2       Before the trial started in the pretrial
3  conference, Mr. Tillery said he was not going to argue
4  to the jury that Checkpoint was litigious. Well,
5  here we are.
6       MR. TILLERY: I never once used the word
7  litigious before the jury. If you look it up, it
8  doesn't mean what you think.
9       I have the OED definition and you can see it
10  later.
11       Your Honor, I'm asking for an agreement or
12  instruction from the Court that this argument not be
13  permitted. If it is going to be permitted, I have to
14  have the opportunity to cross-examine the man that put
15  in the affidavit, that's only fair.
16       MR. SUPLEE: I can argue from what's in the
17  record. They can argue from what's in the record. If
18  one of us steps over the line, you will tell us to get
19  back on the other side of the line.
20       MR. TILLERY: I'm asked for the line to be
21  demarked, so there's no lack of clarity. I don't want
22  the jury poisoned, so that I have to get up in his
23  argument and object. I don't like to do that.
24       THE COURT: I think the basic problem is that
25  there is a disagreement as to what the facts are.

Page 92

1       I think Mr. Suplee sees them in one way as
2  related to the tags, the defense in another way. It
3  is up to the jurors to determine what the facts are in
4  this case.
5       If the evidence that comes in that number
6  one, the tags are available in the marketplace, and
7  have been available in the marketplace.
8       Number two, there has been testing on
9  competitor's products.
10       Number three, that the tags were mailed,
11  whether or not they were received is an issue. They
12  were in fact mailed.
13       I think it makes it clear factually what can
14  be argued and what can't be argued.
15       I can't give him an advisory objection before
16  I hear - - advisory ruling from the Court before I
17  hear what he will say, if it is objectionable.
18       MR. TILLERY: I'll jump on it real quick when
19  I hear it.
20       THE COURT: I'm sure you will.
21       MR. TILLERY: If that is the case, I still
22  think it is only fair I have the opportunity to
23  cross-examine the gentleman that put in an affidavit
24  on this factual issue.
25       I need the cleansing power of

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                 Day 10, 2/09/07

Page 93

1    cross-examination to elicit the truth.
2         MR. SUPLEE: For heavens sake.
3         MR. TILLERY: This affidavit was drafted by
4    counsel, it refers to a memorandum that he did
5    regarding the subject, which was not attached or
6    provided. Who knows what that says. Who knows what
7    other documents exist. Who knows what he did or
8    didn't do. There are a bunch of questions I would
9    like to ask the gentleman on cross-examine to clarify
10   what he meant by this attorney created affidavit.
11        MR. BREINER: I sent a number of documents,
12   maybe 2,000 and they get 1,997, they just didn't get
13   the tags?
14        THE COURT: It says shortly after the
15   production was made, inventory of production and
16   generated work product in the memorandum.
17        After review of that memorandum and my
18   independent recollection of the events, he is saying
19   that All-Tag did not produce the RF labels.
20        MS. QUINN: We haven't seen that memorandum.
21        MR. TILLERY: This letter sent to them was
22   dated November 21st of 2002. He doesn't say, Steven
23   Armstrong of my office never received this or he
24   received it and only got photocopies, not the real
25   tags. He doesn't say anything about the document that

Page 94

1    we are talking about. He makes a general response
2    about it. It is not even the guy that received the
3    letter. It was addressed to Mr. Armstrong not Mr.
4    Cashel. I don't know who Mr. Cashel is or what he has
5    to do with this matter.
6         Armstrong was lead counsel for the case. He
7    is guy that was addressed. He is the guy that
8    received it. Where is he? I have a subpoena going to
9    him too. I don't know who Cashel is.
10        THE COURT: My suggestion is you have already
11   subpoenaed them. I think they should be brought in.
12   You can speak to them to so if you are satisfied.
13   I'll speak to them to see where we are going.
14        I don't think it is the kind of issue that
15   needs, I won't say distract the jurors because it is
16   an important factual issue, but I don't want it to be
17   blown up.
18        MR. TILLERY: I agree, your Honor, that's why
19   I offered two reasonable solutions. One to limit the
20   argument and/or a stipulation. Neither one of them is
21   acceptable. I'm open to other suggestions as well.
22        THE COURT: I think the important thing to
23   see where we stand, when the people come in to tell us
24   what actually occurred.
25        MR. TILLERY: Perhaps we can do that outside

Page 95

1    of the hearing of the jury.
2         THE COURT: That would be fine.
3         MR. SUPLEE: Perhaps.
4         THE COURT: Okay.
5         MR. SUPLEE: We will not close today.
6         MR. TILLERY: We would prefer that Mr. Suplee
7    relax over the weekend and gather this thoughts as
8    well.
9         THE COURT: At the rate we are going it will
10   probably be too late in the afternoon.
11        MR. SUPLEE: Probably Tuesday, your Honor.
12        MR. TILLERY: I want him fresh anyway.
13        THE COURT: Well, Tuesday we are supposed to
14   have a snow storm.
15        MS. QUINN: We will talk fast on Monday.
16        THE COURT: We will recess to 1:30.
17        MS. QUINN: Thank you.
18        MR. BREINER: Thank you.
19        (Luncheon recess)

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                Day 10, 2/09/07

Page 96

```
1                    AFTERNOON SESSION

2                    THE CLERK:  ALL RISE

3                    THE COURT:  GOOD AFTERNOON.

4                    MR. TILLERY:  YOUR HONOR, I HAVE SOME

5    GOOD NEWS FOR THE COURT.  MR. MCKINLEY AND I WERE ABLE

6    TO DO SOME SHUTTLE DIPLOMACY AMONGST OURSELVES HERE

7    WITHOUT EVEN HENRY KISSINGER GETTING INVOLVED.  WE HAVE

8    A STIPULATION THAT WILL RESOLVE A STICKY PROBLEM.

9                    THE STIPULATION IS THAT NEITHER PARTY

10   SHALL ARGUE TO THE JURY THAT DEFENDANTS DID OR DID NOT

11   PRODUCE THE ACCUSED ALL-TAG PRODUCTS TO PLAINTIFF IN

12   DISCOVERY.  AND THAT WOULD INCLUDE THE AFFIDAVITS OF MR.

13   CASHEL AND MR. BREINER NOT BE PUT INTO EVIDENCE SO I

14   DON'T KNOW IF THEY ACTUALLY MOVED OR NOT.

15                   THE COURT:  NO.

16                   MR. TILLERY:  WE WANT TO MAKE SURE THAT

17   THEY ARE NOT.

18                   THE COURT:  THEY WERE NOT.

19                   MR. TILLERY:  IF THAT IS ACCEPTABLE TO

20   YOUR HONOR, I BELIEVE THAT IT IS ACCEPTABLE TO ALL

21   PARTIES.

22                   MR. MCKINLEY:  YES.

23                   THE COURT:  IT IS ACCEPTABLE TO THE COURT

24                   MS. QUINN:  IT'S ACCEPTABLE TO US AS

25   WELL, YOUR HONOR.
```

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                    Day 10, 2/09/07

Page 97

1      MR. BREINER: IT'S ACCEPTABLE TO ME, YOUR
2  HONOR.
3      MR. TILLERY: THANK YOU, YOUR HONOR.
4      MS. QUINN: AND YOUR HONOR, ONE MORE
5  HOUSEKEEPING MATTER BEFORE WE BEGIN.
6      I UNDERSTAND WE MIGHT NOT HAVE MOVED INTO
7  EVIDENCE DEFENDANT'S EXHIBIT 115 AND 149. WE WOULD LIKE
8  TO DO THAT AT THIS TIME.
9      THE COURT: 115.
10     MS. QUINN: CORRECT, 115 AND 149.
11     THE COURT: OKAY.
12     (DEFENSE EXHIBITS 115 AND 149 ADMITTED
13 INTO EVIDENCE.)
14     MR. TILLERY: YOUR HONOR, ON THAT POINT
15 THE GENTLEMAN THAT I MENTIONED FROM MONTGOMERY MCCRACKEN
16 WILL NOT BE SUBPOENAED AND IF THEY WERE GOING TO COME
17 IN, WE DON'T NEED THEM.
18     MR. MCKINLEY: THE SUBPOENAS WERE NOT
19 SENT?
20     MR. TILLERY: THEY WERE GOING TO BE
21 SERVED MOMENTARILY, SO IT'S SHUT DOWN. IT'S NOT
22 NECESSARY.
23     MR. MCKINLEY: OKAY.
24     THE COURT: OKAY. I GUESS MISS QUINN,
25 TECHNICALLY, EITHER YOU OR MR. BREINER WOULD HAVE TO

Page 98

1  REST IN FRONT OF THE JURY. I DON'T KNOW THAT WE DID
2  THAT.
3      MS. QUINN: I BELIEVE MR. BREINER DID,
4  YOUR HONOR.
5      THE CLERK: ALL RISE.
6      (JURY IN.)
7      THE COURT: GOOD AFTERNOON, YOU MAY BE
8  SEATED.
9      LADIES AND GENTLEMEN, THE DEFENDANTS HAVE
10 RESTED AND WE ARE NOW SHIFTING INTO ANOTHER PHASE OF
11 THIS TRIAL. WE ARE SHIFTING INTO WHAT IS KNOWN AS
12 REBUTTAL SO MR. SUPLEE.
13     MR. SUPLEE: YES, YOUR HONOR, IF I MAY,
14 JUST TO GIVE EVERYBODY SOME HOPE, WE WILL HAVE MR.
15 AUSTIN AND DR. ZAHN AND A SHORT DEPOSITION EXCERPT AND
16 THAT WILL BE IT.
17     THE COURT: OKAY.
18     MR. SUPLEE: CHECKPOINT CALLS NEIL
19 AUSTIN.
20     (NEIL AUSTIN PREVIOUSLY SWORN.)
21     DIRECT EXAMINATION
22 BY MR. SUPLEE:
23 Q.   SO SINCE YOU WERE PREVIOUSLY SWORN, MR. AUSTIN,
24 YOU UNDERSTAND THAT YOU ARE STILL UNDER OATH HERE TODAY?
25 A.   YES, I DO.

Page 99

1  Q.   AND JUST BY WAY OF REMINDER, YOU HELD THE
2  POSITION OF GENERAL COUNSEL FOR CHECKPOINT?
3  A.   YES.
4  Q.   COULD YOU REMIND US WHAT YEARS THAT WAS?
5  A.   FROM JUNE OF 1989 UNTIL JULY, 2003.
6  Q.   THE LAST TIME YOU WERE HERE YOU TESTIFIED ABOUT
7  YOUR ROLE IN CHECKPOINT'S ACQUISITION OF ACTRON AND THE
8  '555 PATENT?
9  A.   YES.
10 Q.   BUT LET'S MOVE ONTO SOME OTHER THINGS.
11     DID YOU KNOW LUKAS GEIGES?
12 A.   YES.
13 Q.   DID HE WORK FOR CHECKPOINT FROM APPROXIMATELY
14 1994 TO 1998?
15 A.   YES.
16 Q.   ARE YOU FAMILIAR WITH THE CIRCUMSTANCES OF THE
17 TERMINATION OF HIS EMPLOYMENT AT CHECKPOINT?
18 A.   YES.
19 Q.   COULD YOU TELL US WHAT HAPPENED?
20 A.   MR. GEIGES, I GUESS IN MID JULY OF 1998, WAS
21 ADVISED BY THE CHIEF EXECUTIVE OFFICER THAT HIS SERVICES
22 WERE BEING TERMINATED AS A RESULT OF A REDUCTION IN
23 COSTS, IF YOU WILL.
24 Q.   AND WHAT HAPPENED THEN?
25 A.   SHORTLY THEREAFTER, DURING THE COURSE OF AN

Page 100

1  INVESTIGATION BEING CONDUCTED BY MYSELF, WE DETERMINED
2  THAT MR. GEIGES HAD BEEN CONSPIRING, IF YOU WILL, WITH
3  THE GENERAL MANAGER OF OUR JAPANESE OPERATIONS IN ORDER
4  TO POSSIBLY FORM A NEW AND COMPETING COMPANY IN JAPAN.
5  Q.   DID YOU UNDERTAKE THIS INVESTIGATION AT
6  SOMEONE'S DIRECTION?
7  A.   YES.
8  Q.   AND AT WHOSE DIRECTION?
9  A.   THE PRESIDENT, CHIEF EXECUTIVE OFFICER.
10 Q.   AND AFTER YOU DISCOVERED THIS INFORMATION ABOUT
11 MR. GEIGES, WHAT HAPPENED THEN?
12 A.   IN ACCORDANCE WITH MR. GEIGES'S EMPLOYMENT
13 AGREEMENT, IF HE HAD BEEN TERMINATED, HE WAS ENTITLED TO
14 A NUMBER OF MONTHS SEVERANCE PAY. DURING THE COURSE OF
15 THE -- OF SHORTLY AFTER HE WAS TERMINATED, WHEN WE
16 DETERMINED THAT HE WAS ACTING IN CONFLICT WITH HIS
17 AGREEMENT, WE -- THE COMPANY MADE A DECISION NOT TO PAY
18 HIS SEVERANCE PAY.
19 Q.   AND THEN WHAT HAPPENED? LET ME BACK UP A
20 SECOND.
21     WHEN YOU SAY YOU DID THAT, WAS SOME
22 DETERMINATION MADE AS TO WHETHER OR NOT HE HAD BEEN
23 TERMINATED FOR CAUSE?
24 A.   WELL, HIS EMPLOYMENT CONTRACT HAD PROVISIONS IN
25 IT THAT DEALT WITH WHAT WOULD HAPPEN IF YOU WERE

Checkpoint Systems, Inc. v. All-Tag Security S.A., et al.                                     Day 10, 2/09/07

Page 124

1  with me.
2        As a result of our visit to All-Tag I sat
3  down with Gary Mazoki and described to him what I had
4  seen.
5        In conjunction with that, I also gave that
6  same information to Mr. Mazoki, had written a
7  memorandum summarizing that information.  A copy of
8  that also went to Mr. Wacker.  Mr. Wacker in this
9  memorandum is now making some additional comments to
10  Mr. Mazoki, in addition to what I had been saying to
11  Mr. Mazoki.
12  Q.  Directing your attention to the, I guess the fifth
13  paragraph beginning with the words:  Boels mentioned.
14  A.  Yes.
15        MR. SUPLEE:  If we can highlight that.
16  BY MR. SUPLEE:
17  Q.  Boels mentioned they intend to officially enter
18  the U.S. market in September.
19        Does that comport with your recollection of
20  what was said?
21  A.  Yes, it does.
22  Q.  There has been testimony, Mr. Austin, that you
23  said that Checkpoint would lead All-Tag with legal
24  fees.
25        Did you say during that meeting or anything

Page 125

1  like that?
2  A.  No.
3  Q.  There has been testimony that you said that you
4  would put All-Tag Belgium into bankruptcy.
5        Did you say that or anything like that?
6  A.  No.
7  Q.  There has been testimony that you acted in a
8  brutal way toward the All-Tag representatives, did you
9  play the ugly American?
10  A.  No, not in the least.  I thought we had a rather
11  pleasant meeting given the circumstances of the
12  parties being competitors and opposing each other.
13        In fact what I considered to be a very
14  pleasant lunch, where even personal areas were
15  discussed.
16  Q.  Briefly, let's move to the second lawsuit, the
17  second Swiss lawsuit filed on April 21, 1998.
18        Can you tell us what patent was involved
19  there?
20  A.  Two patents, one was the Lichtblau deactivation
21  patent.  The other was the Swiss equivalent of the
22  European patent, Jorgensen hole in the dielectric,
23  which I think is the way that one can say it is a
24  counterpart of the '555 patent, which is registered in
25  the United States.

Page 126

1  Q.  We heard testimony from one of the patent
2  witnesses sometime within the last couple of weeks
3  about how one goes about obtaining a European patent,
4  are you generally aware that you can obtain a European
5  patent?
6  A.  Yes, well while not being a patent attorney
7  generally one files --
8        MR. TILLERY:  Can I object to this.  This
9  constitutes expert testimony on patent law.  The
10  gentleman just established he is not a patent lawyer
11  and he shouldn't be able to testify about how to apply
12  for patents and we already has testimony from two
13  experts.
14        THE COURT:  I'll sustain the objection.
15  BY MR. SUPLEE:
16  Q.  Can you tell us what you as general counsel of
17  Checkpoint know about European patents and how to
18  obtain them?
19        MR. TILLERY:  The same objection, your Honor.
20  He is trying to weasel it in a different way.
21        THE COURT:  Again, I'm not quite sure what
22  you are seeking.
23        MR. SUPLEE:  I can say it, your Honor.
24        THE COURT:  Why don't you just ask the
25  question.

Page 127

1        MR. SUPLEE:  Okay.
2  BY MR. SUPLEE:
3  Q.  You referred in your answer to a European patent
4  and you referred to the Swiss counterpart to the '555
5  patent, did I hear you right?
6  A.  That's correct.
7  Q.  Can you tell us, if you know, what the connection
8  is between the European patent and the Swiss
9  counterpart?
10        MR. TILLERY:  Objection, your Honor.  He is
11  talking about European and Swiss patent law.
12        THE COURT:  Overruled.  He made reference to
13  both.
14        Overruled.
15  Q.  In applying for a patent, there are two ways in
16  which an inventor can apply for a patent.  One is
17  apply to the European Patent Office, where there is an
18  examination by the European patent office.
19        MS. QUINN:  Your Honor, I'm sorry to
20  interrupt.  I thought we would get his personal
21  knowledge of what he knew about the relationship.  We
22  are now getting the same testimony about European
23  patent law, something that in fact the parties had
24  agreed, U.S. patent law --
25        THE COURT:  The question is what is the

2 (Pages 124 to 127)

Day 10 Trial 2-9-07 Part 8.TXT

24

25

229

1                           INDEX

2

3    DEFENSE WITNESSES

4      Gary Mazoki

5        (via deposition excerpts)          p.  16

6

7    PLAINTIFF'S REBUTTAL WITNESSES   D      C      RD      RC

8      Neil Austin              98     140    226

9

10

11

12

13                        CERTIFICATE

14        We certify that the foregoing transcript is a

15   true and accurate record of the proceedings in the

16   above-captioned matter.

17   _____      _____

18   Date                  Nancy O'Neill

19   _____      _____

20   Date                  Suzanne White

21   _____      _____

22   Date                  Sidney Rothschild
                           Page 5

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHECKPOINT SYSTEMS, INC.,
Plaintiff

vs.          Civil Action
              01-2223
ALL-TAG SECURITY S.A.,
ALL-TAG SECURITY AMERICAS, INC.,
and SENSORMATIC ELECTRONICS CORP.,
Defendants

Day 11 of Trial
February 12, 2007
Courtroom 9-B
Philadelphia, PA

Before THE HONORABLE PETRESE B. TUCKER, J.
and a Jury

APPEARANCES:

Dennis R. Suplee, Esq.          For the Plaintiff
Thomas W. Hazlett, Esq.
Robert A. McKinley, Esq.
SCHNADER HARRISON SEGAL
   & LEWIS LLP
1600 Market Street
Suite 3600
Philadelphia, PA  19103-7286

Nancy O'Neill
Suzanne White
Sidney Rothschild
Official Court Reporters
1234 U.S. Courthouse
601 Market Street
Philadelphia, PA  19106

APPEARANCES:  (cont'd)

Theodore A. Breiner, Esq.          For All-Tag
Jennifer A. Harchick, Esq.
BREINER & BREINER, LLC
115 North Henry Street
Alexandria, VA  22314

Tracy Zurzolo Quinn, Esq.
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

M. Kelly Tillery, Esq.          For Sensormatic
Erik N. Videlock, Esq.
Charles Marion, Esq.
PEPPER HAMILTON, LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA  19103-2799

---

Page 3

1    PROCEEDINGS
2        THE COURT:  Good morning.
3        Are there any matters we need to cover before
4    the jurors are brought out?
5        MR. BREINER:  No, your Honor.
6        MR. SUPLEE:  Your Honor, I will just mention
7    that we had submitted three supplemental points for
8    charge which I assume the court has.  And the assignor
9    estoppel issue is still hanging there, but I don't think
10   the court need deal with it at this point before the
11   jurors is brought out.
12       THE COURT:  Yes.  Okay.
13       MR. TILLERY:  For the record, we received
14   those recently and we would oppose that for a variety of
15   reasons, and we will explain when appropriate.
16       MR. BREINER:  All-Tag joins him.
17       THE COURT:  We can bring out our jurors.
18       (At 9:45, the jury entered the courtroom.)
19       THE COURT:  Good morning.  You may be seated .
20   I think they did turn up the air in here
21   today.  So if you get cold, let me know.  But it is
22   noticeably cooler in here today.
23       MR. HAZLETT:  Your Honor, as the next part of
24   Checkpoint's rebuttal case, we would like to read in a
25   portion of the Rule 30 (b)(6) deposition of Sensormatic

---

Page 4

1    Electronics Corp. by HUBERT A. PATTERSON.  The
2    deposition was held on July 14, 2006.  I attended on
3    behalf of Checkpoint and Mr. Tillery represented
4    Sensormatic.
5        THE COURT:  Okay.
6    BY MR. HAZLETT:
7    Q    Beginning on page 61 of the transcript.
8        Mr. Patterson, let me hand you what has
9    previously been marked as plaintiff's exhibit 100.  It's
10   a two-page outline Bates stamped SEN 000591 through 92.
11   Have you seen this document before today?
12       MR. TILLERY:  Excuse me.  My copy says P-17.
13       MR. HAZLETT:  Your Honor, it does.  But as
14   everyone has been doing thoughout this trial, I will be
15   substituting the trial exhibit number for the deposition
16   exhibit number.
17       MR. TILLERY:  Okay.  Excuse me.
18       MR. HAZELTT:  No problem.
19   BY MR. HAZLETT:
20   Q    Let me read that again.
21       Mr. Patterson, let me hand you what has
22   previously been marked as plaintiff's exhibit 100.  It's
23   a two-page outline Bates stamped SEN 00591 through 92.
24   Have you seen this document before today?
25   A    Yes, I have.

Checkpoint Systems, Inc. v. All-Tag Security, S.A., et al.

Page 29

1  are talking about claim 1 now -- did you hear Dr. Rose
2  say that his reading of claim 1 required that the
3  short-circuit needs to appear through the space or along
4  the wall of the space?
5  A   I heard him say that.
6          MR. BREINER:  Objection, your Honor.
7          THE COURT:  Well, he has answered.  I'm going
8  to overrule to this question.
9          He said yes.
10  BY MR. McKINLEY:
11  Q   Now, Dr. Zahn testified about what his
12  understanding of that claim was.
13          THE COURT:  Dr. Rose.
14          MR. McKINLEY:  Thank you.
15  BY MR. McKINLEY:
16  Q   Dr. Rose testified about what his understanding of
17  that portion of the claim was.  And I want to ask you
18  not about your reading of the claim, Dr. Zahn, but about
19  what one of skill in the art would have understood the
20  last part of that claim to mean.
21          MR. BREINER:  Your Honor, same objection.  He
22  testified on his direct as to what the claim meant, and
23  now he is asking him to testify again what the claim
24  meant.
25          THE COURT:  Well, overruled.  Overruled.

Page 30

1          You may answer.
2          THE WITNESS:  The way I would look -- it's a
3  very simple phenomenon that we are trying to describe
4  here.
5          If you make -- manufacture a tag without a
6  throughhole, and you find that it has an extremely high
7  voltage for deactivation, and then if you take that same
8  tag and the only change you make is to put a throughhole
9  within the dielectric layer and it deactivates at very,
10  very low voltages, then that throughhole has served as
11  the means for short circuit deactivation of the tag.
12  And that's the language of the fourth element of claim
13  1.
14  BY MR. McKINLEY:
15  Q   So with regard to Dr. Rose's testimony about what
16  he thought a path was, do you recall hearing him testify
17  about that?
18  A   Yes.
19  Q   What do you believe one of ordinary skill in the
20  art would read that claim to mean with regard to a short
21  circuit path?
22  A   Well, that the throughhole provides the means for
23  the short-circuit deactivation of the tag.  More than 90
24  percent of the time the spark discharge will travel
25  entirely through the throughhole, but on occasion it

Page 31

1  will not necessarily travel all the way entirely in the
2  throughhole, but perhaps partly within the dielectric
3  material.
4  Q   Did you hear Dr. Rose talk about differences
5  between the process that is shown in the '343 patent and
6  the All-Tag process that has been in place since 2001?
7  A   You said differences?
8  Q   Yeah.  Did you hear Dr. Rose talk about differences
9  between the process that is shown in the '343 patent --
10  and let me put a sharper edge on it.
11  A   Okay.  Now I understand your question.  But let me
12  let you start again.
13  Q   Do you recall Dr. Rose's testimony that were
14  identifying certain things that were present in the
15  All-Tag process as it's used in Belgium distinct from
16  what is shown in the '343 patent, do you remember him
17  saying that?
18  A   I do.
19  Q   Do those differences change your opinion?
20  A   No, not at all.
21          MR. BREINER:  Objection, your Honor.
22          THE COURT:  Overrulled.
23  BY MR. McKINLEY:
24  Q   And why not?
25  A   Well, the differences were, for example, the exact

Page 32

1  temperature of the heating rod to compress the
2  electrodes together, the amount of time they had been
3  applied, what the pressure was, none of that is
4  necessary.
5          The fourth element of claim 1 and claim 15
6  doesn't care how the throughhole was made, what the
7  temperature was, what the pressure was, how long it
8  took.  All that's needed is a throughhole that provides
9  a means for short-circuit deactivation.  Doesn't matter
10  temperature, exact process.  But if the result is a
11  throughhole, then it practices that
12  element.
13  Q   Did you hear Dr. Rose's testimony about what is
14  required under the scientific method?
15  A   Yes.
16  Q   When you use the scientific method, there is a
17  starting point, right?
18  A   Yes.  Because you can't reinvent all of science and
19  start from the beginning.  There are certain learned
20  truths that have been verified by many investigators.
21  They are publishing authorative journals and
22  textbooks.  You have to start at a certain level and
23  then advance knowledge from that level.
24  Q   Did you take certain facts as true in this case?
25  A   Yes.

Page 33

1  Q   And what facts did you take as true?
2  A   The patents '343 and '466 patents.
3  Q   And why did you take those as true?
4  A   Well, those are documents that have been submitted
5  to the court.  They must be -- and to the patent office.
6  They must be truthful and they -- The records show that
7  those patents describe the manufacutring processes
8  practiced by All-Tag.
9  Q   And who told that you?
10  A   Well, Dr. Rose's rebuttal report of June 16th, 2006
11  was the most explicit that says that All-Tag prior to
12  2001 practiced the '466 patent, after 2001 practiced the
13  '343 patent.
14       But there was also deposition testimony by Mr.
15  Boels that explicitly stated now we practice the '343
16  patent.  That is what All-Tag practices.
17       And then also there was -- I think it's March
18  31st of 2006, All-Tag and Sensormatic's responses to
19  Checkpoint's requests for admissions.
20  Q   And all those things that you mentioned, you had
21  the All-Tag and Sensormatic responses to requests for
22  admissions, you had Dr. Rose's rebuttal report and you
23  had Mr. Boels' testimony.  If you didn't have those
24  three things, what would you have done differently?
25       MR. BREINER:  Objection, your Honor.  He

Page 34

1  testified on his direct --
2       THE COURT:  Sustained.
3  BY MR. McKINLEY:
4  Q   Dr. Zahn, did you hear Dr. Rose's testimony that he
5  does not believe that what you did in conducting your
6  work rose to the proper level to establish with
7  reasonable scientific certainty that the tags infringed,
8  did you hear him say that?
9  A   Yes, I did.
10  Q   Now, what would you have done differently if you
11  did not have the information that you had regarding the
12  second process that defendants talked about?
13       MR. BREINER:  Objection, your Honor.  Same
14  objection as before.
15       MR. McKINLEY:  Your Honor, the defendants have
16  challenged Dr. --
17       THE COURT:  Let's go to sidebar.
18       (Sidebar as follows:)
19       MR. McKINLEY:  Your Honor, the defendants have
20  challenged Dr. Rose's work and that what he did was not
21  enough to rise to a level of reasonable degree of
22  scientific certainty.  They have essentially said that
23  he should have done things differently.  He should have
24  done things differently.  And all I'm trying to do is to
25  establish through Dr. Zahn what did he rely on.  That is

Page 35

1  perfectly proper to rebut Dr. Rose's testimony that what
2  he did was not enough.
3       THE COURT:  Well, he has already said what he
4  relied on.
5       MR. McKINLEY:  But I'm trying to say why did
6  he not -- in other words, why did he not study the
7  product, too?  They put that in through Dr. Rose, that
8  he should have studied product 2.  And I want to say why
9  did he not do that.  I should be able to do that.
10       THE COURT:  Well, on direct he testified that
11  he didn't -- it was brought out that he didn't study
12  product 2.
13       MR. TILLERY:  He didn't even see it, or study
14  it.
15       THE COURT:  And he said he didn't need it to
16  reach his conclusion.
17       MR. McKINLEY:  Right.  But it wasn't brought
18  out why he didn't need it.  And I didn't need to bring
19  it out until the defendants brought up that it wasn't
20  enough.
21       THE COURT:  And you say why he didn't need it.
22       MR. McKINLEY:  Because he had other
23  information that pointed him -- that told him what the
24  product was.
25       MR. BREINER:  He said that.

Page 36

1       THE COURT:  He did say that.
2       MR. BREINER:  He said he had all 10 things and
3  he said he could just rely on any one of them --
4       THE COURT:  Because the question was asked on
5  redirect why, you know, why did you do it, did you need
6  this, why didn't you need it?  These particular sets of
7  questions were asked to him on redirect after cross
8  examination in the case in chief.
9       MR. McKINLEY:  I'm just trying to establish,
10  your Honor, that if he didn't have these things what
11  would he have done in that case.  I think the jury
12  should know he didn't just blatantly decide not to look
13  at product 2.  He had information and that is why he
14  didn't need to do that.  And that is rebutting what Dr.
15  Rose said.
16       THE COURT:  You are asking him why -- what is
17  he going to say?
18       MR. McKINLEY:  I'm asking him what would you
19  have done if you didn't have any information -- if the
20  defendants didn't tell you anything essentially about
21  their second process, what would you have done?
22       He is going to say I would have studied the
23  product, but I didn't need to because I had all of this
24  information.  That is what he is going to say.  Just
25  like he did the first time.

Page 38

1  BY MR. McKINLEY:
2  Q.  Dr. Zahn, just to circle back for a moment.  You
3  said you were in the courtroom when Dr. Rose
4  testified, that it wasn't enough for you to rely on a
5  '343 patent to reach a conclusion that the All-Tag
6  product made in accordance with that patent contains a
7  throughhole and that the throughhole provides a
8  short-circuit path, right?
9  A.  I heard that.
10  Q.  How did you learn that All-Tag was manufacturing
11  labels after 2001 according to the process described
12  in the '343 patent?
13  A.  From Dr. Rose's rebuttal report of June 16, 2006.
14  Q.  Anything else?
15  A.  Mr. Boels' testimony.  And from All-Tag and
16  Sensormatic's responses to the request for admissions
17  by Checkpoint attorneys.
18  Q.  How many times did All-Tag tell you that it makes
19  resonant labels according to the process in the '343
20  patent after 2001?
21     MR. BREINER:  Objection.
22  A.  335 times.
23  Q.  335 times?
24  A.  That is correct.
25  Q.  How many times did Sensormatic tell you that

Page 39

1  All-Tag makes its resonant labels according to the
2  process in the '343 patent after 2001?
3  A.  Also 335 times.
4     MR. McKINLEY:  May I approach the witness?
5     THE COURT:  Yes.
6  Q.  Dr. Zahn, I hand you two binders, correct?
7  A.  Yes.
8  Q.  If you can look at the first binder which is
9  marked plaintiff's exhibits 25 through 29?
10  A.  Yes.
11  Q.  What are they?
12  A.  The title is defendant All-Tag's S.A. and All-Tag
13  Security Americas Incorporated responses to
14  plaintiff's first set for admissions.
15  Q.  And, is that one of the documents that - - is that
16  one of the documents that starts to - - let me state
17  it again.
18     You mentioned that All-Tag had mentioned 335
19  times that they made the product under the '343 patent
20  after 2001, right?
21  A.  Yes.
22  Q.  Does that binder the proof?
23  A.  Yes.
24  Q.  And what is the second binder of documents?
25  A.  The same thing but for Sensormatic.

Page 40

1  Q.  What do you mean by the same thing?
2  A.  Just read the title, Sensormatic's responses to
3  Checkpoint's request for admissions.
4  Q.  That's marked as plaintiff's Exhibit 19 through
5  23, right?
6  A.  Yes.
7  Q.  If you can look at the first request for admission
8  and the answer.
9     What does it say?
10     What was Checkpoint asking All-Tag to admit
11  in that first request for admission?
12  A.  All-Tag was supposed to say if they agree or
13  disagree with the statement All-Tag's resonance labels
14  are deactivatable.
15  Q.  What was their response?
16  A.  Well, rather than just a simple yes, which would
17  be the correct response --
18     MR. BREINER:  Your Honor.  I object he is
19  testifying.
20     THE COURT:  Sustained.
21  BY MR. McKINLEY:
22  Q.  Do they point to the two patents in that response?
23  A.  Yes.
24     MR. TILLERY:  If we talk about the response,
25  let's read the entire response, that's what is

Page 41

1  appropriate in requests for admissions.
2     MR. McKINLEY:  I agree, your Honor.
3     MR. BREINER:  I have a more basic objection.
4  This response was up on the board in their direct
5  case.  Nobody disputes that it the response was made.
6     All-Tag will stipulate to its response, it
7  was identical for all 385 of the requests that we
8  objected to them on a number of grounds and that we
9  answered with the one same response.
10     MR. TILLERY:  Your Honor, we are going
11  through what was gone through in the case in chief.
12     THE COURT:  I'll permit you to read this one
13  but hopefully we will not do it for all of them.
14     MR. McKINLEY:  We are not.  We will do the
15  one.
16     THE COURT:  Go ahead.
17  A.  Okay.  At the very beginning there is some
18  objection.  So let me read it for completeness.  It
19  says objection.  See general objections incorporated
20  herein by reference.
21     All-Tag further objects to the request on the
22  grounds that it is vague, indefinite and/or ambiguous
23  without waiving the objections and subject thereto,
24  All-Tag admits that the All-Tag Security S.A.
25  deactivatable resonance tags are made generally in

Checkpoint Systems, Inc. v. All-Tag Security, S.A., et al.

Day 11, 02/13/07

Page 42

1  accordance with U.S. patent 5,187,466 and as found by
2  the International Trade Commission investigation
3  number 337-TA-347 or on the United States patent
4  application serial number 10/472,088, filed March 19,
5  2001.
6        All-Tag has previously produced the '466
7  patent and the '088 patent application to Checkpoint.
8        All-Tag has also previously produced the ITC
9  decision to Checkpoint and to which case Checkpoint
10  was a party.
11        To the extent further responses required,
12  denied.
13  Q. Without getting into the rest, the 334 mentioned
14  in the first set of admissions, can you generally
15  characterize what the requests were? What types of
16  questions were asked of All-Tag?
17  A. Simple declarative --
18        MR. BREINER: Objection, your Honor.
19        THE COURT: Sustained.
20  BY MR. McKINLEY:
21  Q. Were the statements about the structure of the
22  tag?
23        MR. BREINER: Objection, your Honor.
24        THE COURT: Sustained.
25  BY MR. McKINLEY:

Page 43

1  Q. Let's back up a moment, Dr. Zahn.
2        When did you receive the labels that we
3  discussed last week which you conducted tests on?
4  A. In February of 2004.
5  Q. Did you do your testing shortly after receiving
6  them?
7  A. Yes, I did.
8  Q. When did you receive the combined 670 statements
9  that the All-Tag resonance labels were made generally
10  in accordance with the '466 patent and the ITC
11  determination?
12        MR. BREINER: Objection.
13  Q. Or the '343 patent?
14        THE COURT: Overruled. You may answer.
15  A. I received them around April of 2006.
16  Q. What did you do when you received them?
17  A. I read this very, very carefully for more
18  information about the All-Tag labels.
19  Q. Did you make any decisions about what to do?
20        MR. BREINER: Objection, your Honor. It is
21  the same objection we had at sidebar.
22        THE COURT: Sustained.
23  BY MR. McKINLEY:
24  Q. When did you issue your report concluding that the
25  All-Tag products infringed the '555 patent?

Page 44

1  A. I had my first report in June of 2006. And a
2  rebuttal report I believe it is dated June 16, 2006.
3  Q. You refer to Dr. Rose's June 16, 2006 rebuttal
4  report. I believe you said that in that report he
5  strongly - - well, why don't you tell us what did you
6  learn from his report on June 16th?
7        MR. BREINER: Objection, your Honor, it is
8  cumulative, asked and answered.
9        THE COURT: Sustained.
10        MR. McKINLEY: Can I have plaintiff's
11  Exhibit 58? I'm sorry, defendant's Exhibit 58.
12        If we can turn to page nine.
13        MR. BREINER: Objection, your Honor.
14        MR. McKINLEY: Dr. Zahn earlier testified
15  about something he read in Dr. Rose's report. I want
16  to see if this is what he is referring to.
17        MR. BREINER: This is the third time he asked
18  the question.
19        MR. McKINLEY: I didn't relate the document
20  to Dr. Zahn's testimony.
21        MR. TILLERY: Can we take the document down,
22  please.
23        THE COURT: Sustained.
24  BY MR. McKINLEY:
25  Q. I'll ask you one question, I think maybe will sum

Page 45

1  all of this up?
2        Why did you decide to do physical testing as
3  we look at your exhibit of things that you did.
4        MR. McKINLEY: If may approach, your Honor to
5  see the number?
6        THE COURT: Yes.
7  Q. On plaintiff's Exhibit 314, why did you decide to
8  study labels back in 2004, but not study labels or do
9  physical testing on the later products?
10        MR. BREINER: Objection, your Honor. The
11  same objection we had at sidebar.
12        THE COURT: Sustained.
13  BY MR. McKINLEY:
14  Q. The defendants, and Dr. Rose suggested that you
15  cannot reach a conclusion to a reasonable degree of
16  scientific certainty that a product meets the elements
17  of the claim in the patent unless you physically
18  examine what they call product 2 itself.
19        Do you agree with that statement?
20  A. No.
21  Q. Why?
22  A. Because the record stated that product 2 of
23  All-Tag was made exactly the way that it's described
24  in the '343 patent.
25        I went to the '343 patent. I saw that it had

Checkpoint Systems, Inc. v. All-Tag Security, S.A., et al.                    Day 11, 02/13/07

Page 46

1  a throughhole used for short-circuit deactivation of
2  an RF resonant label; to my mind that was case closed.
3  It had practiced the two important sub elements of the
4  element four of claim one and claim 15. It had a
5  throughhole and which provided a means for
6  short-circuit deactivation of an RF resonant label.
7      MR. McKINLEY: No more questions.
8      THE COURT: Mr. Breiner.
9      MR. BREINER: Just a second, your Honor, to
10  put the notes together.
11      MR. McKINLEY: Before Mr. Breiner begins, may
12  I move the plaintiff's exhibits in, 19 through 23 and
13  25 through 29?
14      THE COURT: Yes.
15      CROSS-EXAMINATION
16  BY MR. BREINER:
17  Q. Dr. Zahn, you were testifying about these requests
18  for admissions and the answers by All-Tag. Do you
19  recall that?
20  A. Yes.
21  Q. Are you aware that the requests for admissions
22  went to a number of different All-Tag labels?
23  A. I believe five different labels.
24  Q. Are you aware that some of those labels
25  encompassed non-deactivatable tags?

Page 47

1  A. I'm aware of that.
2  Q. So in response to the first one, All-Tag's
3  resonant labels are deactivatable, wouldn't you agree
4  with me you couldn't answer that yes, they are, when
5  it is going to a non-deactivatable tag?
6      MR. McKINLEY: Objection.
7      THE COURT: Overruled. The Doctor I'm sure
8  can answer.
9  A. I mean the correct answer, All-Tag makes some
10  deactivatable tags and some non-deactivatable tags.
11  Q. You can't admit or deny that, can you?
12      I'll put up the first request for admission.
13  I wrote down your testimony.
14      You testified a second ago that All-Tag
15  admitted that they make their product, process 2 and
16  product 2 exactly, you used the word exactly as
17  disclosed in these patents.
18      Is there any anyplace in there that says
19  exactly?
20  A. I didn't say that. I said they are made generally
21  in accordance. I read it exactly the way it is
22  written there. Generally in accordance.
23  Q. I understand that. The answer you just told this
24  jury that you relied on a '343 patent because it was
25  All-Tag admitted that they made their product exactly,

Page 48

1  you used the word exactly.
2      Did you use the word exactly?
3  A. When I spoke?
4  Q. Yes.
5  A. I think the transcript would probably say if I did
6  or didn't.
7      I probably did because Dr. Rose's report says
8  the process for the post 2001 tags are made by the
9  '343 patent.
10      Mr. Boels' deposition - - you asked me a
11  question.
12      THE COURT: Let him finish.
13      THE WITNESS: Mr. Boels' deposition testimony
14  also says we make the tags according to the '343
15  patent.
16  BY MR. BREINER:
17  Q. Do they say exactly?
18  A. The word exactly? I would like to have Mr. Boels'
19  transcript and look up with an index, look up the word
20  exactly but he says - -
21      THE COURT: The question is not what they
22  said. The question is what you said?
23      THE WITNESS: No. We have gone beyond that.
24      As I understand the question was, is where it
25  might have said that All-Tag practiced its new tags

Page 49

1  exactly the way that the '343 patent described.
2  BY MR. BREINER:
3  Q. That was your testimony this morning five minutes
4  ago, wasn't it?
5  A. Yes.
6  Q. This statement here says that All-Tag admits that
7  All-Tag Security S.A. deactivatable resonance tags are
8  made generally. It doesn't say exactly, it says
9  generally, doesn't it?
10  A. I read it exactly that way. Generally in
11  accordance. That's this document but the other
12  testimony didn't use the word generally.
13  Q. Were you are here in Court last week when Dr. Rose
14  testified in his expert rebuttal report that he meant
15  that they used the processes generally?
16  A. That's not what his report says.
17  Q. I am asking you, were you here when he testified
18  that way?
19  A. I was here.
20  Q. That's all I asked you.
21      Let's talk a little bit about the issue of
22  obviousness.
23      Now, the '555 patent refers to the Lichtblau
24  '473 patent as prior art?
25  A. I have to double check. I believe so.

**Checkpoint Systems, Inc. v. All-Tag Security, S.A., et al.**

Day 11, 02/13/07

Page 114

1    MR. TILLERY:  YOUR HONOR AS THE CLAIM
2  THAT SENSORMATIC IS IN PRIVITY WITH THE ORIGINAL
3  ASSIGNOR REMINDS ME A LITTLE BIT OF SIX DEGREES OF
4  SEPARATION OUT OF A RUBE GOLDBERG STEP-BY-STEP OR SIX OR
5  SEVEN WAYS DOWN THE LINE HERE.
6    THE TWO THINGS YOUR HONOR MENTIONED.
7  ONE, THE INDEMNITY, YES, THERE IS INDEMNITY, AND IT IS
8  AN INDEMNITY THAT EVERY GOOD LAWYER SHOULD HAVE KNOWN
9  ABOUT FROM MOMENT ONE IN THIS CASE.  IT IS UNDER THE
10  UNIFORM COMMERCIAL CODE.  THE UNIFORM COMMERCIAL CODE
11  SPECIFICALLY PROVIDES THAT IF I SELL SOMEONE A PRODUCT
12  AND THAT ULTIMATE PRODUCT IS ALLEGED TO INFRINGE
13  SOMEONE'S PATENT, THAT THERE IS AN INDEMNITY.  THE
14  SELLER HAS TO INDEMNIFY THE BUYER.  THERE IS ACTUALLY AN
15  INTERNATIONAL TREATY REGARDING THAT AS WELL.
16    SO IF INDEMNITY WERE ENOUGH TO ESTABLISH
17  ASSIGNOR ESTOPPEL, THEN IT WOULD ALWAYS BE THE CASE IN
18  EVERY CASE WHERE YOU HAD A PURCHASER OF A PRODUCT SUCH
19  AS SENSORMATIC.  THAT IS WHY IT IS ONE OF THE REASONS
20  WHY IT IS NOT.  THE SECOND ITEM WAS WHETHER OR NOT
21  SENSORMATIC WAS INVOLVED OR SOMEHOW THE PLAINTIFF'S
22  MOTION ACTUALLY SAYS THAT WE JOINTLY DEVELOPED THE
23  INFRINGING LABELS, WHICH IS SIMPLY NOT TRUE.
24    ON PAGE 4 TO 5 OF OUR RESPONSE, YOUR
25  HONOR, WE SET FORTH IN DETAIL THAT SENSORMATIC WAS NO

Page 115

1  MORE THAN A VERY DEMANDING CUSTOMER, AND WE WANTED TO
2  INSURE THE PROPER QUALITY THAT THESE THINGS ACTUALLY
3  WORKED AND THAT THEY WORKED ON A REGULAR BASIS.  AND
4  THAT IS WHAT OUR INVOLVEMENT WAS.  OUR INVOLVEMENT WAS
5  NOT AS A JOINT DEVELOPER, AND IT IS LUDICROUS TO SAY
6  THAT.
7    THERE IS ALSO A CLAIM THAT WE WERE THE
8  EXCLUSIVE DISTRIBUTOR FOR SEVERAL YEARS.  WELL, THE
9  RECORD REFLECTS THAT THAT IS NOT TRUE EITHER.  WE WERE
10  THE EXCLUSIVE DISTRIBUTOR IN THE U.S. FOR LESS THAN ONE
11  YEAR AND THAT RELATIONSHIP ENDED IN 1998.  THE CITES ARE
12  SET FORTH AT PAGE 5 OF OUR RESPONSE.
13    SENSORMATIC IS LESS -- THIS RF TAG STUFF
14  IS LESS THAN ONE PERCENT OF SENSORMATIC'S BUSINESS.  WE
15  FOCUS ON OUR ACOUSTO-MAGNETIC TECHNOLOGY.  SUBSTANTIALLY
16  DIFFERENT.
17    UNDER ALL OF THOSE CIRCUMSTANCES, THE
18  NOTION THAT WE ARE SOMEHOW IN PRIVITY WITH MR. JORGENSON
19  WHO IS WAY UP OR DOWN THE LINE IS SIMPLY WRONG, YOUR
20  HONOR.  THEREFORE ASSIGNOR ESTOPPEL CANNOT APPLY, AND
21  INDEED IS REALLY IS LAW OF THE CASE AT THIS POINT AS
22  WELL.  THANK YOU.
23    MR. SUPLEE:  FIRST, VERY BRIEFLY, YOUR
24  HONOR.
25    THE NOTION THAT THE ASSIGNOR MUST

Page 116

1  ENVELOPE THE OTHER PARTY FOR THIS TO BE PRIVITY, THAT
2  CASE HAS BEEN CITED BY THE DEFENDANTS.  THE CASE, THE
3  LANGUAGE GENERALLY IN THE CASES IS MUCH MORE LIBERAL
4  THAN THAT.  THE KEY CASE IS THE SHAMROCK CASE WHICH
5  FOCUSES UPON THE QUESTION OF WHETHER THE ONE IN --
6  ASSERTED TO BE IN PRIVITY, THAT IS HERE ALL-TAG, WHETHER
7  IT HAS BENEFITED FROM THE KNOWLEDGE OF THE INVENTOR
8  ASSIGNOR AND BY THAT STANDARD, THERE IS NO QUESTION THAT
9  ALL-TAG HAS BENEFITED FROM THE KNOWLEDGE OF THE INVENTOR
10  ASSIGNOR JORGENSEN.
11    SECONDLY, WITH RESPECT TO THE QUESTION OF
12  WHETHER ALL-TAG IS USING EFFECTIVELY THE '555 PATENT,
13  MR. BREINER IS RIGHT IN SAYING THAT AT THIS POINT THAT
14  IS A DISPUTED ISSUE BUT WE WILL SOON HAVE AN ANSWER TO
15  THAT.  SO A POSSIBILITY IS THAT IF THAT ISSUE MATTERS TO
16  THE COURT IN TERMS OF MAKING THIS DECISION, THE COURT
17  CAN ALWAYS DEFER ITS RULING ON ASSIGNOR ESTOPPEL UNTIL
18  IT HAS THE JURY'S RULING ON INFRINGEMENT AND, OF COURSE,
19  IF THE JURY RULES AGAINST US ON THAT ISSUE THEN THERE IS
20  NOTHING MORE TO TALK ABOUT, PERHAPS, BUT WE WILL WAIT
21  AND SEE.
22    THE COURT:  AT LEAST NOT TO ME.
23    MR. SUPLEE:  AT LEAST NOT TO YOU.
24    AND FOR ONE THING, ALL-TAG DOES IN FACT
25  ADMIT THAT IT IS CURRENTLY USING THE '343 PATENT WHICH

Page 117

1  DOES HAVE ALL OF THE ESSENTIAL ELEMENTS OF THE '555
2  PATENT AND THAT IS JORGENSEN'S PATENT.
3    THE COURT:  AS TO THE -- I GUESS I WILL
4  START FROM THE BEGINNING -- THE DEFENSE RULE 50 MOTION,
5  THE COURT WILL DENY THAT MOTION.  I THINK THAT THE
6  TESTIMONY -- OR THE EVIDENCE IS SUFFICIENT TO GO TO THE
7  JURY ON THE ISSUE OF INFRINGEMENT.
8    ON PLAINTIFF'S RULE 50 MOTION ON THE
9  INVENTORSHIP, THE COURT WILL DENY THAT MOTION.
10  LIKEWISE, I THINK THE TESTIMONY IS SUFFICIENT, THAT THE
11  JURY COULD FIND BY CLEAR AND CONVINCING EVIDENCE AND
12  CORROBORATION AS TO OWNERSHIP SO THAT ISSUE WILL GO TO
13  THE JURY.
14    ON THE ISSUE OF EQUITABLE ESTOPPEL AND
15  THE OTHER EQUITABLE DEFENSES, THE COURT WILL SUBMIT
16  THOSE TO THE JURY.
17    ON THE ISSUE OF THE REVERSE DOCTRINE OF
18  EQUIVALENCE, I THINK THAT THERE IS AN ISSUE AND THE
19  COURT WILL GRANT THE RULE 50 MOTION ON THE REVERSE
20  DOCTRINE OF EQUIVALENCE.
21    ON THE ISSUE OF EQUITABLE ASSIGNOR
22  ESTOPPEL, THE COURT WILL DENY THAT AS RELATES TO BOTH
23  DEFENDANTS.
24    I WILL JUST ADD FOR THE RECORD THAT IF
25  THE COURT WERE TO GRANT IT AS TO ALL-TAG, THE EVIDENCE

**Checkpoint Systems, Inc. v. All-Tag Systems, S.A., et al.**                    Day 11, 02/13/07

Page 234

1   YOU AND THE ISSUES THAT YOU HAVE BEEN ASKED TO DECIDE.
2   AS YOU'RE BACK IN THAT ROOM, THINKING ALL THOSE THINGS
3   OVER AND GETTING READY TO FILL OUT YOUR QUESTIONNAIRE, I
4   WOULD LIKE YOU TO LEAVE WITH THAT ONE PARTING THOUGHT
5   THAT I ASKED YOU AT THE VERY BEGINNING.
6           NOW THAT YOU HAVE HEARD ALL THE EVIDENCE,
7   WHAT DO YOU THINK?  IS THIS A CASE ABOUT PROTECTING A
8   USEFUL INVENTION OR IS IT ABOUT SOMETHING DIFFERENT?
9           THANK YOU.
10          THE COURT:  LADIES AND GENTLEMEN, WE ARE
11  GOING TO RECESS UNTIL TOMORROW MORNING.  WE STILL HAVE
12  TO HEAR FROM ONE DEFENSE ATTORNEY AND THEN WE HEAR FROM
13  MR. SUPLEE AND THEN, AFTER THAT, I WILL GIVE YOU
14  INSTRUCTIONS AND EXPECT THAT YOU WILL BEGIN YOUR
15  DELIBERATIONS TOMORROW.  LET'S HOPE THE SNOW HOLDS OFF.
16  IT'S NOT SUPPOSED TO SNOW VERY LATE ON TUESDAY NIGHT.
17  HAVE A GOOD NIGHT.
18          THE CLERK:  ALL RISE.
19          (JURY OUT.)
20          THE COURT:  OKAY.  YOU MAY BE SEATED.  SO
21  WE SHOULD BE ABLE TO GET STARTED FIRST THING TOMORROW
22  MORNING.
23          MR. TILLERY:  I'LL BE READY, YOUR HONOR.
24          MR. SUPLEE:  I'M SORRY.  WHAT TIME DID
25  YOU SAY?

Page 235

1           THE COURT:  9:30.
2           MR. SUPLEE:  THANK YOU.
3           MR. TILLERY:  YOUR HONOR, I'M SORRY.  I
4   NOTICE THE JURY HAD A CALL-IN NUMBER IN THE EVENT THAT
5   THERE IS SNOW.  I HAVE NOT HEARD THE LATEST REPORTS.
6           THE COURT:  THEY DO HAVE A CALL-IN
7   NUMBER, SO THAT IF THERE IS ANY ISSUE THEY CAN CALL, BUT
8   I'M SURE THEY WON'T BE CLOSING THE COURTS.  MAYBE
9   WEDNESDAY, BUT NOT TOMORROW.
10          MR. TILLERY:  I DID NOT HEAR THE REPORT
11  LATELY.
12          THE COURT:  HAVE A GOOD NIGHT.
13          ALL COUNSEL:  THANK YOU, YOUR HONOR.
14          (COURT ADJOURNED AT 4:30 PM.)
15
16          WE CERTIFY THAT THE FOREGOING IS A
17  CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
18  ABOVE-ENTITLED MATTER.
19
20  DATE              OFFICIAL COURT REPORTER
21
22  DATE              OFFICIAL COURT REPORTER
23
24  DATE              OFFICIAL COURT REPORTER
25

Page 236

1           INDEX
2   WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
3   HUBERT PATTERSON
4   (DEPOSTION EXCERPTS)  4
5   MARKUS ZAHN       10    46
6
7
8   CLOSING ARGUMENTS              PAGE
9
10  BY MR. SUPLEE              125
11  BY MS. QUINN              186
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF PENNSYLVANIA

 3                         -   -   -

 4    CHECKPOINT SYSTEMS, INC.    :   CIVIL DOCKET FOR CASE
                                  :   NO. 2:01-CV-02223-PBT
 5         -vs-                   :
                                  :
 6    ALL-TAG SECURITY S.A.       :

 7                         -   -   -

 8                     Philadelphia, Pa.

 9                     January 15, 2009

10         BEFORE HONORABLE PETRESE B. TUCKER

11                      ORAL ARGUMENT

12

13   APPEARANCES:

14   For the Plaintiff:    SCHNADER HARRISON SEGAL & LEWIS, LLP
                           BY:   DENNIS R. SUPLEE, ESQ.
15                         AND
                           THOMAS W. HAZLETT, ESQ.
16                         1600 Market Street, Suite 3600
                           Philadelphia, PA 19103-7286
17                         (215) 751-2068

18
     For the Defendant:    PEPPER HAMILTON, LLP
19                         BY:   M. KELLY TILLERY, ESQ.
                           3000 Two Logan Square
20                         Eighteenth and Arch Streets
                           Philadelphia, PA 19103-2799
21                         (215) 981-4750)

22
                            LYNN MCCLOSKEY
23                      OFFICIAL COURT REPORTER
                          1234 US Courthouse
24                        601 Market Street
                        Philadelphia, PA 19106
25                        (856) 649-4774
```

```
 1      APPEARANCES  (Cont.)

 2

 3      For  the  Defendant:    BREINER  &  BREINER,  L.L.C.
                                BY:  THEODORE  ADAM  BREINER,  ESQ.
 4                              115  North  Henry  Street
                                Alexandria,  Virginia  22314
 5                              (703)  684-6885

 6                              REED  SMITH  LLP
                                BY:   TRACY  ZURZOLO  Quinn  ESQ.
 7                              2500  One  Liberty  Place
                                1650  Market  Street
 8                              Philadelphia,  PA  19103
                                (215)  851-8286
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    refusal to produce any opinions of its legal or

2    technical advisers, whereas, here, the good faith

3    basis of the party's actions is at issue.   That's

4    the case of SGS Thompson Microelectronics versus

5    International Rectifier.

6              Your Honor, as we explained in our

7    brief, this case is positively a cornucopia of bad

8    faith, justifying exceptional case find.   Not only

9    did Checkpoint, one, fail to compare the actual

10   accused product of any actual defendant to the

11   claims of the patent; two, Checkpoint failed to

12   secure a valid written opinion from a competent U.S.

13   patent counsel to support its claim; three, it was

14   found guilty of enactable conduct latches, which

15   alone under the law we cited is sufficient to make

16   the case exceptional; and, four, last but certainly

17   not least, it used this meritless patent litigation

18   for anticompetitive purposes.   This is truer the

19   perfect storm of a Section 285 exceptional case.

20             Finally, Your Honor, Defendants seek

21   only fees and costs they actually incurred in being

22   required to defend this meritless, useless patent

23   case.   We do not here, as we could under the law,

24   seek enhanced fees.   All we want to do is get our

25   head above water and be recompensed for what we had

1    litigation when the patentee did not even compare

2    the accused product, the patent claim to the accused

3    product.

4              Your Honor, we say, as a matter of law,

5    that failure renders this case exceptional.  But if

6    you look at the conduct of Checkpoint throughout

7    this trial, there are other basis in conjunction

8    with that that call for a finding of an exceptional

9    case.  I will touch on those briefly.

10             The issue of equitable and estoppel.

11   That jury came back with an advisory finding that

12   their patent was unenforceable.  All-Tag raised that

13   issue at the beginning of this lawsuit, and

14   Checkpoint was well aware of it throughout.

15   Checkpoint never provided All-Tag at any time of any

16   written opinion or any allegation infringement.

17   There was one oral statement in '97, and after that

18   there was nothing.

19             After '97, All-Tag continued to invest

20   money.  Mr. Blieck and Mr. Boels, as they testified,

21   put 6- to $7 million of their own money into the

22   company.  They said they wouldn't do that if they

23   thought they were going to be sued.  They opened

24   All-Tag in October 2000.  They wouldn't have done

25   that if they thought they were going to be sued.

1

2

3

4

5

6

7          I CERTIFY THAT THE FOREGOING IS A

8     CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN

9     THE ABOVE-ENTITLED MATTER.

10

11

12

13    DATE                    OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25